UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
_____

TRACY DUANE LAUTNER,

                Petitioner,                Case No. 1:07-cv-142

v.                                    Honorable Robert J. Jonker

MARY BERGHUIS,

                Respondent.

_____/

## REPORT AND RECOMMENDATION

        This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C. § 2254. Petitioner was convicted in the Kalkaska County Circuit Court of the following eleven offenses arising out of a crime spree that occurred on March 15, 2003: (1) unlawfully taking possession of and driving away motor vehicle, MICH. COMP. LAWS § 750.413; (2) third-degree fleeing and eluding, MICH. COMP. LAWS § 257.602a(3); (3) assault with the intent to commit great bodily harm less than murder, MICH. COMP. LAWS § 750.84; (4) carrying or possessing a firearm while committing or attempting to commit the felony stated in count three (felony-firearm), MICH. COMP. LAWS § 750.227b; (5) first-degree home invasion, MICH. COMP. LAWS § 750.110a(2); (6) armed robbery, MICH. COMP. LAWS § 750.529; (7) carjacking, MICH. COMP. LAWS § 750.529a; (8) felony-firearm during the commission of either or both of counts 6 and 7, MICH. COMP. LAWS § 750.227b; (9) assault with the intent to commit murder, MICH. COMP. LAWS § 750.83; (10) carjacking, MICH. COMP. LAWS § 750.529a; and (11) felony-firearm during the commission of either or both of counts 9 and 10, MICH. COMP. LAWS § 750.227b. On August 3, 2004, Petitioner

was sentenced as a second habitual offender to the following periods of imprisonment: 36 to 90 months for Count 1, 36 to 90 months for Count 2, 30 to 72 months for Count 3, 2 years for Count 4, 14 to 30 years for Count 5, 20 to 40 years for Count 6, 20 to 40 years for Count 7, 2 years for Count 8, 20 to 40 years for Count 9, 20 to 40 years for Count 10, and 2 years for Count 11. In addition, Petitioner was ordered to make payments totaling $13,945.03.

In his *pro se* petition, Petitioner raises six grounds for relief, as follows:

I.  DEFENDANT WAS DEPRIVED OF EFFECTIVE ASSISTANCE OF COUNSEL WHERE EXPERT TESTIMONY WAS PRESENTED THAT DEFENDANT LACKED SUBSTANTIAL CAPACITY TO APPRECIATE THE NATURE AND QUALITY OR THE WRONGFULNESS OF HIS CONDUCT, BUT THAT DEFENDANT COULD CONFORM HIS CONDUCT TO THE REQUIREMENTS OF THE LAW, AND COUNSEL ARGUED ONLY THAT DEFENDANT COULD NOT CONFORM HIS CONDUCT TO THE REQUIREMENTS OF THE LAW AND DID NOT ARGUE THAT DEFENDANT LACKED SUBSTANTIAL CAPACITY TO APPRECIATE THE NATURE AND QUALITY OR THE WRONGFULNESS OF HIS CONDUCT.

II.  DEFENDANT WAS DENIED A FAIR TRIAL BY THE PROSECUTOR'S MISCONDUCT IN CROSS-EXAMINATION OF DEFENDANT IMPLYING THAT A VERDICT OF NOT GUILTY BY REASON OF INSANITY WOULD RESULT IN HIM BEING SET FREE.

III.  DEFENDANT'S FIFTH, SIXTH, AND FOURTEENTH AMENDMENT RIGHTS WERE VIOLATED WHEN HIS TRIAL ATTORNEY FAILED TO HAVE THE CLINICIAN OF HIS CHOICE PERFORM A FULL PSYCHIATRIC EVALUATION.

IV.  DEFENDANT WAS DEPRIVED OF EFFECTIVE ASSISTANCE OF COUNSEL WHEN HIS TRIAL ATTORNEY FAILED TO HAVE THE CLINICIAN OF DEFENDANT'S CHOICE PERFORM A FULL PSYCHIATRIC EVALUATION.

V.  DEFENDANT'S FIFTH, SIXTH, AND FOURTEENTH AMENDMENT RIGHTS WERE VIOLATED WHEN THE TRIAL JUDGE RULED THAT AN EXPERT WITNESS'S TESTIMONY AT TRIAL BE LIMITED TO EXCLUDE HIS OPINIONS OF DEFENDANT'S STATE OF MIND AT THE TIME OF THE INSTANT OFFENSES.

VI.     THE PROSECUTION'S TAMPERING OF [SIC] EVIDENCE WAS A
        VIOLATION OF DEFENDANT'S FIFTH, SIXTH, AND FOURTEENTH
        AMENDMENT RIGHTS.

        Respondent has filed an answer to the petition (docket #5) stating that the grounds

should be denied because they are procedurally defaulted or have no merit.  Petitioner filed a reply

(docket #6).  Upon review and applying the AEDPA standards, I find that Petitioner's grounds for

habeas corpus relief are without merit.  Accordingly, I recommend that the petition be denied.

### Procedural History

### A.     Trial Court Proceedings

        The charges against Petitioner arose from a crime spree that occurred on March 15,

2003, over several northern Michigan counties.  Petitioner was tried before a jury on June 14-18,

2004.[1]  The defense theory was that Petitioner was criminally insane at the time he committed the

offenses, and, thus, should be found not guilty of the charges by reason of insanity.  Specifically,

Petitioner asserted that he was acting under the belief that God was directing his conduct through

the use of various signs.  He further claimed that his primary motivation on the day the offenses

occurred was to get the police officers to chase him, engage him in a shootout, and kill him.

        Mark Soper testified that he worked at Bill Marsh Auto Sales on March 15, 2003.

(Tr. I, 198.)  Soper identified Petitioner as the man who came into the dealership and asked to take

a truck for a test drive.  (Tr. I, 199, 204.)  Petitioner wanted to drive the truck alone, but Soper

---

[1]The trial transcripts will be referred to as follows:
Jury Trial Day 1, June 14, 2004 (Tr. I)
Jury Trial Day 2, June 15, 2004 (Tr. II)
Jury Trial Day 3, June 16, 2004 (Tr. III)
Jury Trial Day 4, June 17, 2004 (Tr. IV)
Jury Trial Day 5, June 18, 2004 (Tr. V)

explained that it was company policy for a sales person to ride along for test drives. (Tr. I, 200.) Petitioner drove the truck while Soper sat in the passenger seat. (*Id.*) Petitioner drove the truck very fast and in a manner that made Soper uncomfortable. When they returned to the dealership, Petitioner thanked Soper and said something to the effect that he did not seem to want to help him out. (Tr. I, 202.) Petitioner left the dealership in an older-model Jeep Wrangler. (Tr. I, 204.)

Greg Morley testified that he was employed by Williams Chevrolet in March 2003. (Tr. I, 207). On March 15, 2003, a man Morely identified as Petitioner came into the dealership and said he was interested in buying a used red Sonoma truck that was on the lot. (Tr. I, 207-209, 214.) There already was a set of keys in the truck, but Morley went inside to get the dealer plates. Morley also mentioned that he needed to make a copy of Petitioner's driver's license. (Tr. I, 209-10.) When Morley went back outside, Petitioner was gone and he could see the red Sonoma truck driving away. (Tr. I, 211.) Morley got into his car and followed the truck. (Tr. I, 212.) When he got near the truck, it picked up speed and started to run the lights and stop signs. (*Id.*) Morley called 911. (Tr. I, 213.) The next time Morely saw the truck was at the sheriff's department. (Tr. I, 214.) Morley testified that nothing seemed unusual about Petitioner before he stole the truck. (Tr. I, 217.)[2]

Kalkaska Police Officer Mark Bonfiglio testified that he received the call about a stolen truck at about 3:20 p.m. on March 15, 2003. (Tr. I, 222-23.) Bonfiglio spotted the stolen truck an hour or two later on Cedar Road when Bonfiglio was stopped at a traffic light. (Tr. I, 223-24.) As Bonfiglio prepared to pursue the truck, a state trooper also saw the truck and made a U-turn to follow it. Bonfiglio activated his lights and began to follow the state trooper. (Tr. I, 224.) Both

---

[2]It is undisputed that Petitioner drove three different stolen cars over the course of the day: (1) a red GMC Sonoma truck stolen from Williams Chevrolet; (2) a blue Ford Ranger stolen from the Flynn residence; and (3) a Kalkaska County patrol car stolen from Deputy Griffith.

police cars were marked and had their lights and sirens activated. (Tr. I, 225-27.) At some point, a county sheriff's department car also joined the pursuit. (Tr. I, 226.) The driver of the truck began to fire shots out of the driver's side window toward the police cars. (Tr. I, 228.) The police officers continued to chase the truck for twenty-two miles until the truck reached a dead end on a dirt road. (Tr. I, 229-34.) By the time the officers arrived, the driver had fled the truck. (Tr., 235.) Bonfiglio conducted a cursory inspection of the truck while the other officers went into the woods looking for the driver. (Tr. I, 237-38.) Bonfiglio found an empty shotgun case, some shotgun shells, a box of shotgun shells, a half-empty bottle of Jack Daniels, and a backpack containing clothing and a water purifier. (Tr. 238-39.)

Jedidiah Flynn testified that he was at home in Mancelona on the afternoon of March 15, 2003. (Tr. I, 251-52.) His wife, Bonnie Flynn, and brother, Benjamin Flynn, also were at the home when Jedidiah heard a knock at the door. (Tr. I, 253.) Jedidiah walked toward the front door and saw a man he did not recognize standing outside. (Tr. I, 255.) At trial, Jedidiah identified Petitioner as the man who came to the door. (Tr. I, 269.) Jedidiah was not certain whether he or Petitioner opened the door, but Jedidiah saw that Petitioner was carrying a shotgun. (Tr. I, 255.) At some point, Petitioner entered the house without an invitation. (Tr. I, 255.) Petitioner said that he needed a vehicle and told Jedidiah to get the keys to his brother Ben's Ford Ranger truck parked out front. (Tr. I, 256-57.) When Jedidiah did not respond quickly, Petitioner raised his voice and told him that he needed the keys. (Tr. I, 257-58.). Jedidiah went to tell his brother that he needed his car keys. (Tr. I, 258-59.) While his brother was getting the keys, Petitioner told Jedidiah to get him a pair of scissors so he could cut the phone line in the kitchen. (Tr. I, 260-61.) After he cut the phone line, Petitioner walked out the door, but came back and asked if there were any more phones

in the house.  (Tr. I, 263.)  Jedidiah gave Petitioner his wife's cell phone, but did not disclose the fact that there were additional telephones in the master bedroom and office.  (Tr. I, 263-64.)  Petitioner took the cell phone and left in Ben's truck.  (Tr. I, 262.)

Bonnie Flynn testified that she was in her bathroom changing clothes when she heard the knock at the door.  She heard her husband answer the door and then heard another voice she did not recognize saying "get the keys now" or something to that effect.  (Tr. II, 6.)  When she finally walked out into the living room, she saw only her husband and brother-in-law, who both were looking at the door.  (Tr. II, 6-7.)  They told her that a man had cut the kitchen phone line and was trying to steal Ben's truck.  (Tr. II, 7.)  Bonnie testified that as she was turning back toward the bedroom to call the police, the man came back in through the door with a shotgun and asked if there were any other phones in the house.  (Tr. II, 8.)  Bonnie identified Petitioner as the man who was in her house.  (Tr. II, 9.)  Bonnie saw Petitioner coming and tried to hide under a blanket in the living room.  (Tr. II, 8.)  Her husband gave Petitioner her cell phone, which was sitting on the kitchen island.  (*Id.*)  Before he left, Petitioner apologized for taking the truck and told them not to call the police for at least an hour.  (Tr. II, 11, 15.)  As soon as Petitioner reached the end of the driveway, Bonnie called 911.  (Tr. II, 11.)

Benjamin Flynn testified that his blue Ford Ranger pickup truck was stolen from his brother's house on March 15, 2003.  (Tr. II, 17.)  Ben testified that his brother went to answer the door and then came back and asked for his car keys.  (Tr. II, 20.)  Ben's keys were in his duffel bag in the kitchen.  (Tr. II, 21.)  When Ben came out of the room where he had been playing video games with his brother, he saw Petitioner standing in the middle of the kitchen with a shotgun in his hand.  (Tr. II, 20.)  As Ben was handing Petitioner the keys, Petitioner said, "I'm sorry to do this to

ya, fellas." (Tr. II, 22.) Petitioner told them that he needed scissors or a knife. When they did not respond, Petitioner repeated his demand in a louder voice. (*Id.*) When his brother gave Petitioner a pair of scissors, he cut the phone line in the kitchen. (*Id.*) On his way out the door, Petitioner told Benjamin that he would be dropping the truck off, and then paused as if he was going to tell him where, but then changed his mind. (Tr. II, 23.) Petitioner also told them to wait an hour before trying to contact the police. (*Id.*) A few moments later, Petitioner came back in the front door and asked if there were other phones in the house. (Tr. II, 24.) Ben's brother initially responded "no," but when Petitioner seemed to be getting angry, Jedidiah gave him a cell phone that was sitting on the kitchen counter. (Tr. II, 24-25.) Petitioner took the cell phone and left. (Tr. II, 25.)

        Michigan State Police Officer Steven Porter testified that he became involved in the pursuit of a stolen truck on March 15, 2003. (Tr. II, 30.) After the truck stopped and the driver fled into the woods, Porter took a long gun from his patrol car and joined the other officers who had gone into the woods to search for the driver. (Tr. II, 33.) Porter could see a man walking in the woods ahead of Trooper Wise. Trooper Wise was instructing the man to stop and put down his weapon, but the man continued to walk away. (*Id.*) The officers lost the man in the woods, but continued to look for him until they received a radio call that he had stolen another vehicle. (Tr. II, 36.) Porter went back to his car and went to join the pursuit. (*Id.*) When Porter arrived near the end of the pursuit, the man was driving a stolen Kalkaska County Sheriff's Department car. (Tr. II, 37.) A state trooper stopped the stolen car by ramming into it and then boxing it in. (*Id.*) Porter identified Petitioner as the man who got out of the stolen police car. (Tr. II, 37-38.) Petitioner stood outside the car, but refused orders to get down on the ground. (Tr. II, 65.) He was unarmed and eventually was tackled by police officers. (Tr. II, 39.) Petitioner fought, kicked and yelled at police until he

was placed in handcuffs and leg restraints. (*Id.*) A shotgun was found on the passenger seat of the stolen police car. (Tr. II, 52.) The gun was not department issued and was not in a holder. (Tr. II, 53.)

Officer Porter inventoried the items found in the red Sonoma truck. (Tr. II, 40.) He found camping equipment, including a sleeping bag, a camping mattress and a tent. (Tr. II, 40-42.) Poter also found some clothing. The following day, Officer Bonfiglio turned over the backpack and shotgun shells that he seized from the truck after the initial stop. (Tr. II, 44.) Porter testified that the ammunition found in the red Sonoma was sixteen-gauge, number 4 shot, which is commonly used for bird hunting. (Tr. II, 60-61.) The backpack contained clothing and a water purifier. (Tr. II, 45.) Porter was present when Morley came to identify the Somona truck. (Tr. II, 54-55.) He and Morley discussed the amount of gas in the truck at the time it left the dealership. (Tr. II, 55.) According to Porter, the truck had three-quarters of a tank of gas when it was recovered. (*Id.*) Porter also examined a Jeep Wrangler that was recovered from Williams Chevrolet. (Tr. II, 46-48.) The Jeep did not have side mirrors or a rearview mirror and had cracks in the windshield and driver's side window, which would be grounds for a police officer to stop the vehicle. (Tr. II, 48-50.)

Michigan State Police Officer Shawn Wise testified that he spotted the stolen Sonoma truck as he was driving on U.S. 131. (Tr. II, 71.) Wise turned around and pursued the truck. (*Id.*) The truck picked up speed and began to weave in and out of traffic. (Tr. II, 72.) As Wise continued the follow the truck with his lights and siren activated, he could see the driver handling a long gun inside the truck. (Tr. II, 73.) The gun came out of the driver's window and shots were fired in the direction of Wise's patrol car. (Tr. II, 73-75.) Wise could hear gunshots striking his car. (Tr. II,

73-74, 105.)  One shot hit on the pillar portion of the door between the windshield and the driver's

side window.  (Tr. II, 98-99.)  Wise testified that when the driver slowed down to make a turn, he

waived at Wise and flipped him off, which struck Wise as strange behavior.  (Tr. II, 104.)  Due to

the poor road conditions, the truck, which was equipped with four-wheel drive, moved ahead of the

patrol cars, which did not have four-wheel drive.  (Tr. II, 77-78.)  After the truck came to a stop at

a dead end, Wise pulled up and saw the driver standing on the passenger side of the truck with a

back pack and a long gun.  (Tr. II, 84.)  The man looked at Wise and walked into the woods.  (*Id.*)

Wise shouted at him to "drop the gun," but he just looked back at Wise and continued to walk away.

(Tr. II, 85.)  Wise took the rifle from his patrol car and followed the man into the woods.  (*Id.*)  Wise

did not shoot at the man because he was not pointing his gun or shooting at the officers.  (Tr. II, 86.)

The officers lost the man after he went over a ridge into a ravine.  (*Id.*)  The officers  received a call

ten or fifteen minutes later that another truck had been stolen.  (Tr. II, 87.)

   Wise testified that he caught up with the pursuit just before the man was captured.

At that time, the man was driving a Kalkaska County Sheriff's Department car.  (Tr. II, 88.)  Wise

assisted with the apprehension.  (Tr. II, 89.)  After the man was subdued and handcuffed, he said

something about having a gun.  (*Id.*)  The man had been shot in the leg, so EMS transported him to

the hospital for treatment.  (Tr. II, 91.)  Wise identified Petitioner as the driver of the truck who was

pursued and apprehended.  (*Id.*)

   Kalkaska County Sheriff's Deputy Aaron Popa testified that he also became involved

in the pursuit of the stolen red Sonoma truck.  (Tr. II, 112.)  Popa attempted to use his patrol car to

block the truck, but the driver was able to get around Popa.  (Tr. II, 115.)  When the truck reached

a dead end and stopped, Popa saw the driver exit the vehicle with a long gun and backpack and walk

into the woods. (Tr. II, 115, 122.) Popa did not shoot at the man because he did not raise his gun or threaten the officers. (Tr. II, 116.) After the man was apprehended, Popa photographed an unlocked shotgun laying on the passenger seat of the stolen patrol car. (Tr. II, 117.) Popa then removed the shotgun from the car to secure it. (Tr. II, 118.) The gun was loaded, but there were no rounds in the chamber. (Tr. II, 119.)

Kalkaska County Detective Abe Devol testified that he also was involved in the long-distance pursuit of Petitioner. (Tr. II, 128.) Devol was working under cover at the time, so he was driving an unmarked car. (*Id*.) When Devol heard that the suspect fled into the woods, he took up a position on the other side of the wooded area and used binoculars to watch for anyone emerging from the wood line. (Tr. II, 129-30.) While he was watching, Devol saw a blue Ford Ranger pickup truck speed out of the driveway of a nearby house. (Tr. II, 130.) The man driving the truck matched the description of the suspect, so Devol followed the truck for some distance. (Tr. II, 131.) The suspect unexpectedly slammed on his breaks and stopped. (Tr. II, 132.) Devol stopped behind the truck. The suspect got out of truck and starting advancing toward Devol's car. (*Id*.) Devol identified Petitioner as the driver of the truck. (Tr. II, 142.) Devol testified that Petitioner held his hands up and did not appear to have any weapons in his possession. Devol got out of his car and identified himself as a police officer. (Tr. II,133.) At that point, Devol's Sheriff's Department jacket and badge were in plain view. Petitioner looked bewildered and ran back to his truck. (*Id*.) Devol ordered him to stop and lay down on the ground, but he did not comply. (Tr. II, 133-34.) Petitioner got back in the truck and locked the door before Devol could catch him. (Tr. 134.) Petitioner dove away while Devol was trying to open the truck door. (Tr. II, 134.)

Devol continued to pursue Petitioner. (Tr. II, 134.) A marked Sheriff's Department car joined the pursuit and positioned itself immediately behind the truck. (Tr. II, 136-37.) After about ten miles Devol lost control of his car and spun out due to the poor road conditions. (Tr. II, 137-38.) When Devol was able to re-join the pursuit, he saw the blue Ford Ranger stuck in a ditch. (Tr. II, 139.) He then saw Deputy Griffith walking down the roadway with his gun out and blood running down his arm. (Tr. II, 139.) Griffith's patrol car was not in sight. Devol determined that Griffith was not seriously injured and went after Petitioner, who now was driving Griffith's patrol car. (Tr. II, 140.)

Kallaska County Sheriff's Deputy Scott Alan Griffith testified that he was chasing the blue Ford Ranger truck when it lost control and slid into a snowbank. (Tr. II, 154-55.) Griffith stopped behind the truck. Petitioner got out of the truck with a long gun and started advancing toward Griffith's car. (Tr. II, 158.) Griffith got out of his car armed with his handgun raised and moved toward the rear of his patrol car. (Tr. II, 158-59.) Griffith began firing shots at Petitioner, but he continued to advance. Petitioner was yelling something at Griffith, but Griffith could not hear him over the siren on his patrol car. (Tr. II, 160.) Griffith moved around to the passenger side of the vehicle and could see Petitioner through the windows. (Tr. II, 161.) Griffith began shooting across the car through the windows. (Tr. II, 161.) He shot until he was out of ammunition; his gun held twelve shots. (Tr. II, 161-62.) As Griffith was planning to reload his gun, his car began to move away. (Tr. II, 163.) After the confrontation was over, Griffith realized that he had been shot and had shotgun pellets lodged all over the right side of his body, including his leg, side, arm, shoulder and head. (Tr. II, 160, 164.) Most of the pellets were concentrated in his right arm. (Tr.

II, 164.)  He was wearing a bullet proof vest when he was shot.  (Tr. II, 168.)  At the time of trial, Griffith still had nine or ten pellets left in his body.  (Tr. II, 166.)

Linden Bielecki testified that he was employed as the Constable for the Township of Mancelona.  (Tr. II, 173.)  As Constable, Bielecki was responsible for ordinance enforcement in the Township, but could not enforce state laws and did not carry a firearm.  (Tr. II, 174.)  Bielecki had been driving behind Devol when Petitioner stopped, got out of the truck and began advancing quickly toward Devol's car.  (Tr. II, 179.)  Bielecki heard Devol say something and then saw Petitioner run back to the truck.  Devol instructed Bielecki to use his car to cut off the truck, but Petitioner got around him and drove away.  (Tr. II, 179-180.)  Bielecki and Devol continued to follow Petitioner, who was ignoring traffic signs and signals. (Tr. II, 180.)  Bielecki continued the pursuit to the location where Petitioner went off the road. (Tr. II, 182.)  By the time he approached, any exchange of gunfire had already occurred and Deputy Griffith's car was gone.  (Tr. II, 182.)  Bielecki stayed with Griffith and administered first aid until more assistance arrived.  (Tr. II, 183-84.)

Steven Hickman of the Michigan State Police Forensic Crime Lab testified that he was involved in the investigation of the scene where Deputy Griffith was shot.  (Tr. II, 189.)  Hickman created a sketch of the scene, which included the location of the blue Ford Ranger truck, broken glass, tire tracks, blood droplets and ten spent cartridge cases. (Tr. II, 190.)  There were two bullet holes in the back of the truck.  (Tr. II, 191.)  Hickman also examined two guns in connection with the shooting - the officer's weapon and a Remington shotgun.  (*Id*.)  The shotgun was recovered from the front seat of the stolen patrol car.  (Tr. II, 192.)  It was a sixteen-gauge semiautomatic shotgun.  (*Id*.)  At the time the shotgun was recovered, it had a round inside the chamber and was

ready to fire. (Tr. II, 193.) There was no other ammunition in the gun. (*Id.*) Because the extractor was missing from the gun, it jammed when multiple test shots were fired. (Tr. II, 194-96.) As a result, the gun had to be reloaded after each shot to prevent jamming. Hickman compared three spent shell casings from the scene of the shooting to the shotgun. He also compared live and spent shotgun shells recovered from inside the red Sonoma truck. (Tr. II, 196-97.) Hickman determined that the two spent shotgun shells recovered from the Sonoma truck were fired from the shotgun. (Tr. II, 197.) A third spent shell found in the stolen patrol car also was fired by that shotgun. (Tr. II, 198-99.) All three shells were Remington number 6 shot. (Tr. II, 200.) According to Hickman, each 6 shot shell contains 225 pellets. (*Id.*) By measuring the pellet pattern on Deputy Griffith's clothing, Hickman opined that the shot that hit Griffith was fired from between twenty and thirty-six feet away. (Tr. II, 204-05.) Twenty-nine pellets hit Griffith's shirt. (Tr. II, 205.) Hickman testified that a load of number 6 shot could be considered a lethal weapon. (Tr. II, 210.) Hickman also matched two bullets and two bullet fragments taken from the scene of the shooting to the officer's service weapon. (*Id.*)

Michigan State Police Detective Sergeant Kevin Day testified that he assisted with the investigation in this case. (Tr. II, 230.) Day went to Charlevoix Community hospital, where Petitioner was taken for treatment following his arrest. (Tr. II, 231.) Shortly before he arrived, Day heard that Petitioner attempted to grab an officer's weapon either at the hospital or on the way to the hospital. (Tr. II, 234-25.) After receiving clearance from the doctor treating Petitioner, Day initially spoke with Petitioner while he was still in the emergency room. (Tr. II, 232.) Day was not sure what medication Petitioner had received at that point, but he may have received some pain medication. (Tr. II, 251.) Day introduced himself and Petitioner responded appropriately to his

questions. (Tr. II, 233.) Day asked Petitioner to consent to a blood test. Petitioner appeared to understand the request and gave his consent. (*Id.*)

Day attempted to conduct a more thorough interview after Petitioner was moved to a private room. (Tr. II, 235.) Another officer informed Petitioner of his *Miranda* rights in the ambulance, but Day wanted to inform him of his rights again before asking any further questions about what had occurred. (Tr. II, 235.) In response to the *Miranda* rights, Day testified that Petitioner gave an ambiguous statement that he needed some time to think about it and "might" want to talk to an attorney. (Tr. II, 236.) Day asked Petitioner what he thought he might be charged with and Petitioner responded, "attempted murder," and was concerned about going to prison for the rest of his life. (Tr. II, 236.) During the conversation, Petitioner talked about his problems and said that God let him down. (Tr. II, 252.) Petitioner also said that if he talked to the police, "people would get hurt." (Tr. II, 253.) After forty-five minutes to an hour of discussion about whether Petitioner was going to waive his rights, Day left Petitioner's room to give him some time to think. (Tr. II, 252.) When Day went back ten or fifteen minutes later, Petitioner stated that he better not talk about the situation. (Tr. II, 237.) In light of his interaction with Petitioner, Day believed that Petitioner understood everything they discussed. (Tr. II, 237.) Day did not tape his conversation with Petitioner. (Tr. II, 253.)

Day took possession of all the clothing that Petitioner was wearing at the time of his arrest. (Tr. II, 238.) Day found a cell phone in the pants pocket. (Tr. II, 238.) Petitioner also had over $200 in cash on his person. (Tr. II, 239). Day prepared search warrants for a 1987 Jeep belonging to Petitioner and for his residence in Traverse City. (Tr. II, 241.) Day recovered a sixteen-gauge shotgun and a box of number 6 birdshot-size shells from the Jeep. (Tr. II, 242.) From

the residence, officers found a handwritten note between the bed mattresses, which contained handwritten notations stating, "w/a silencer and steal it" and "fix shotgun." (Tr. II, 244-45.) Police also seized a black and white composition notebook and a brown notebook from Petitioner's bedroom, which contained hand-written entries. (Tr. II, 246.)

Michigan State Trooper Dave Meder testified that he used a special ramming maneuver that caused the stolen patrol car Petitioner was driving to spin out. (Tr. II, 259-262.) When the car came to a stop, it was blocked in by Meder and other police vehicles. (Tr. II, 262.) Petitioner got out of the car unarmed and began to walk slowly toward the river, which was directly south of the car. (Tr. II, 263.) Several officers were yelling at him, but he did not appear to be listening. (*Id.*) After Petitioner walked about fifteen feet, Trooper Halverson tackled Petitioner to the ground. (Tr. II, 264, 267.) Meder could see Petitioner's mouth moving, but he could not hear what Petitioner was saying over the sirens. (Tr. II, 268.) Meder testified that if Petitioner had reached back into the patrol car for the shotgun, Meder would have shot him. (*Id.*)

Kenneth Berends testified that he lived at 3116 Six Mile Lake Road in East Jordan. (Tr. III, 22.) On March 15, 2003, Berends was out working on his truck when he heard a car pull up in the driveway. (Tr. III, 23.) Berends saw a police car that had shattered windows on the passenger side. (Tr. III, 24-25.) As Berends approached the car, Petitioner got out with a shotgun. (Tr. III, 23-24.) Petitioner asked Berends if he could take his truck for a joy ride. When Berends told him that his truck was not running, Petitioner got back in his car and left. (Tr. III, 24.) After Petitioner left, Berends heard what sounded like handgun fire in the distance. (Tr. III, 25.)

Atrim County Sheriff's Deputy Jonathan Wheatley testified that he joined the pursuit of Petitioner after he had stolen the police car. (Tr. III, 6-11.) As Wheatley was driving down Six

- 15 -

Mile Lake Road looking for Petitioner, he spotted the stolen police car parked in a driveway. (Tr. III, 13.) Wheatley drove by slowly and observed two men standing in the driveway talking. (*Id*.) Wheatley did not want to risk confronting Petitioner at the residence. When Petitioner saw the police car passing by, he got back in the stolen car, backed out of the driveway and drove away. (Tr. III, 14.) Wheatley turned around to follow him. (*Id*.) During that part of the pursuit, Petitioner was not driving at an excessive rate of speed, but he did not stop at stop signs or red lights and showed no intent to stop. (Tr. III, 21.) After his car was stopped by police, Petitioner walked ten or fifteen feet from the car. (Tr. III, 19.) At that point, he started to move back toward the car. One of the officers kicked the car door closed. (*Id*.) Petitioner was yelling profanities when he was apprehended. (Tr. II, 20.)

Grand Traverse Sheriff's Deputy Roy Raska testified that he was present when the chase ended in East Jordan. (Tr. III, 29.) Raska rendered first aid to Petitioner after he was arrested and placed him in the back of a police car. (Tr. III, 29-30.) Petitioner had what appeared to be a gunshot wound to his left thigh. (Tr. III, 30.) Petitioner told Raska that he got shot when he was taking the patrol car. (Tr. III, 31.) During the first aid process, Raska and Sergeant Meachum discussed that a Kalkaska County deputy had been shot. When Petitioner heard that he stated, "Someone got shot? I didn't shoot until they shot at me." (Tr. III, 31.) An ambulance came and transported Petitioner to the hospital. (Tr. III, 30.) During the ambulance ride, Raska informed Petitioner of his *Miranda* rights and agreed to answer some questions. (Tr. III, 31.) Petitioner told Raska that he was living out of his Jeep, which was parked at Williams Chevrolet. (Tr. III, 32.) With regard to the deputy that got shot, Petitioner stated, "Did he get shot, I know I wasn't aiming at him." (*Id*.) Petitioner told Raska that he was test driving trucks at Williams Chevrolet because

he did not think his Jeep could outrun the police. (Tr. III, 33.) Petitioner stated that he did not plan to return the truck when he took it for the test drive. Raska could smell alcohol on Petitioner's breath and got his consent for a blood test after they arrived at the hospital. (*Id.*) Petitioner told Raska around 5:00 p.m. that he had his last drink around 2:00 p.m. (Tr. III, 35.) The blood test results were negative for alcohol. (Tr. III, 35-36.)

Antrim County Sheriff's Deputy Michael Harvey testified that he and Deputy McKinley were charged with guarding Petitioner while he was in the hospital. (Tr. III, 39.) Petitioner's wrists were handcuffed to his bed rails, but the officers removed the handcuffs so that he could be moved to the X-ray table. (Tr. III, 39-40.) While the officers were moving Petitioner from the X-ray table back to his bed, Petitioner reached toward Harvey's gun. (*Id.*) Harvey grabbed Petitioner's hand before he actually reached the gun and he and Deputy McKinley placed Petitioner back in the handcuffs. (Tr. III, 41.)

Harvey further testified regarding the items found in the red Marlboro backpack that was left in the blue Ford Ranger truck. The backpack contained the following: an empty box of shotgun shells; a camera; a CD player and CDs; a bag containing Visine, Rolaids, Ibuprofin, etc.; sunglasses; a compass; a hatchet; a book of matches, lighters, a social security card for Tracy Lautner; telephone calling cards; and a flashlight. (Tr. III, 47-49.) In addition, the backpack contained a brown hardcover journal and a red spiral notebook. (Tr. III, 50.) Writings in the notebooks discussed a plan to steal a Dodge Dakota, which led the officers to the Bill Marsh Dodge Dealership. (Tr. III, 51-52.) The entries in the notebooks from March 14 and 15 indicated that Petitioner planned to travel to Wacora, Oklahoma. (Tr. III, 54.) There was nothing in those entries suggesting that Petitioner planned to kill himself or to have the police do it for him. (*Id.*)

- 17 -

Steven Carl Goeke was the first witness called by the defense. He testified that Petitioner was his roommate between April and October of 2002. (Tr. III, 66.) Petitioner became Goeke's roommate after he responded to an advertisement in the newspaper. Petitioner seemed normal at first, but Goeke began to notice some unusual things about him after a few months. (*Id*.) For example, Petitioner expressed the belief that people could read his thoughts. (Tr. III, 67.) On one occasion, Petitioner was sitting in front of the television with his eyes closed and told Goeke that he was watching it with the third eye in his forehead. (*Id*.) Petitioner also complained of headaches while the third eye was growing out of his forehead. (Tr. III, 77.) When Petitioner read in the newspaper about bad things that had happened, like a flood or tornado, he believed that God was punishing him for something that he had done wrong. (Tr. III, 68.) During the time that they lived together, Petitioner worked for a landscaping company and delivered pizzas. (Tr. III, 69.) Petitioner told Goeke about a trip he took out west to get a message from God. A few days before Petitioner's mother died from cancer, he took another trip for two or three weeks. (*Id*.) Petitioner believed that his mother's cancer was his fault; a punishment from God. (Tr. III, 70.) When Petitioner left on his trip, he packed as much as he could in his Jeep and said that he was going to get a message from God. (*Id*.) Goeke did not allow guns in his house and never saw Petitioner with a gun. (Tr. III, 72.)

Kalkaska County Sheriff's Deputy Richard Gillisse testified that he worked as a corrections officer at the county jail where Petitioner had been incarcerated for fifteen months preceding his trial. (Tr. III, 79-80.) Petitioner was removed from his maximum security cell for one hour per day. (Tr. III, 80.) During that time, he often was taken to the multipurpose room where he could use the computers or watch television. (*Id*.) According to Gillisse, Petitioner got agitated when he watched television because he thought that the people on television were talking about him.

(Tr. III, 80-81.)  Petitioner asked for medication right away, but was refused until he was seen by the doctors required by the jail.  (Tr. III, 81.)  Petitioner was placed on suicide watch for a few weeks because he was very agitated and angry and was yelling and swearing a lot.  (Tr. III, 82.)  Petitioner began to improve after a couple of months when he started receiving medication.  (Tr. III, 81.)  Even after he went on medication, Petitioner occasionally had loud outbursts at the jail.  (Tr. III, 86.)  Gillisse testified that Petitioner received materials about mental illness from his attorney or Community Mental Health.  (Tr. III, 87-89.)

Shirley Robertson, Petitioner's Aunt, testified about an incident that occurred in early 2002, when Petitioner and his girlfriend showed up at her door.  Robertson had not seen Petitioner for a couple of years.  (Tr. III, 99.)  Petitioner was very distressed about a paper that he was trying to show her because he had signed a contract with the devil.  (Tr. III, 94.)  The paper Petitioner showed her was about a truck repossession.  (Tr. III, 96.)  Petitioner was working as a surveyor at that time and used the truck for his survey work.  Petitioner told Robertson that he was having trouble getting his survey jobs done because God was talking to him and he had to leave his job immediately to tend to whatever God wanted him to do.  (Tr. III, 97.)  Petitioner's girlfriend told Robertson that she got calls from Petitioner during the night asking her to come over because he thought that the people going by his house were coming to get him.  (*Id.*)  Petitioner also asked Robertson about Cain and Abel from the bible because he had crossed paths with someone named Cain and believed that was a sign that there was something bad going on.  (Tr. III, 96.)  Robertson believed that Petitioner had a good relationship with his minor son and spent time with him on a regular basis.  (Tr. III, 95, 100.)  Robertson testified that she was concerned about the child's welfare in light of Petitioner's mental state, but only mentioned the issue to her family.  (Tr. III, 101-103.)

Dr. Steven Norris testified that he was a forensic psychologist employed at the Center for Forensic Psychiatry. (Tr. III, 120.) Norris met with Petitioner on May 15, 2003, for a court-ordered forensic evaluation of his competency to stand trial and criminal responsibility. (Tr. III, 122.) At the time Norris interviewed Petitioner, he was not on medication and told Norris that he had not taken medication for some time before he committed the offenses in this case. (Tr. III, 139.) Norris believed that Petitioner was still psychotic when he conducted the evaluation. (*Id*.) Norris concluded that Petitioner was competent to stand trial. (Tr. III, 124.) Norris explained that competency concerns a person's present ability to work with their attorney and the court, and is distinct from criminal responsibility, which concern's a person's mental state at the time of the criminal offense. (Tr. III, 125.) In order to be found criminally insane, a person must be mentally ill at the time of the offense and lack the substantial ability to appreciate the wrongfulness of their behavior or be unable to conform their behavior to the law. (*Id*.) In Norris' opinion, Petitioner was legally insane at the time of the offenses charged in this case. (Tr. III, 126.) Norris further opined that Petitioner could conform his behavior at the time his committed the offenses, but he lacked the appreciation for the wrongfulness of his conduct because he believed that he was being directed by God. (Tr. III, 134.)

Norris testified that he reviewed the report prepared by the prosecutor's expert, Dr. Clark, who found that Petitioner was mentally ill, but not criminally insane at the time of the offenses. (Tr. III, 142.) Their difference in opinion came down to the issue of whether Petitioner could appreciate the wrongfulness of his conduct. Norris explained that Petitioner did things like cutting telephone lines, telling people not to call the police and running away from the police because he knew how people were going to react to him, but his motivation was psychotic, i.e., he

believed he was being directed by God. (Tr. III, 135, 142-43.) Norris opined that Petitioner had confused motives with regard to what he intended to do on March 15; he talked about being killed by police, jumping off the Mackinac Bridge and taking a trip out West. (Tr. III, 135.) According to Norris, his confused plans were consistent with his mental illness. (Tr. III, 136.) Norris testified that Petitioner's behavior on March 15 may not have been consistent with that of a person trying to commit suicide or get killed because he was ambivalent about death. (Tr. III, 138.) Norris could not give an opinion regarding whether Petitioner was trying to hurt someone during the events of March 15. (Tr. III, 140.)

The prosecutor cross-examined Norris regarding inconsistencies with Petitioner's alleged intent to die on the day he committed the offenses. Norris could not recall whether Petitioner's journal entries from March 14 and 15 mentioned anything about committing suicide or getting killed by police. (Tr. III, 151-52.) The entries did include plans to take a trip to Oklahoma to kill a police officer and then to travel on to California. (Tr. III, 152-54.) Norris agreed that all of the gear in Petitioner's truck was more consistent with taking a long trip than committing suicide. (Tr. III, 154.) Norris thought it was possible for Petitioner to fabricate his story that he was suicidal on March 15, 2003, but believed that Petitioner had multiple, confusing plans. (*Id*.) Norris also believed that Petitioner's story was supported by the records from Petitioner's previous hospitalization at Munson when he talked about being fearful of dying or having to die. (Tr. III, 156-57.) Norris agreed that it was common for mentally ill defendants to lie or give a self-serving version of the facts if they think it will help them. (Tr. III, 157-58.) At the same time, it was common for a mentally ill person to have trouble remembering events or to have confused memories. (Tr. III, 157-58.)

Norris testified that Petitioner was aware that the police would chase him if he stole the truck because he still understood cause and effect and how the police and people would react to him, but Petitioner still believed that he was carrying out God's will. (Tr. III, 165.) Norris gave the same explanation when the prosecutor asked why Petitioner apologized to the Flynn's when he stole the truck from their home. (Tr. III, 168-69.) Norris agreed that much of Petitioner's behavior was not consistent with his alleged motive to get shot by the police, but believed that Petitioner had mixed motives regarding whether he wanted to kill himself or be killed. (Tr. III, 168, 172, 180.) Norris conceded that Petitioner never mentioned to anyone on March 15 that he was on a mission from God, nor did he tell anyone that he intended to commit suicide. (Tr. III, 169-71.) Norris also agreed that Petitioner made calculated, goal-oriented decisions throughout the day, but believed that the delusion motivated his conduct. (Tr. III, 182.) Norris testified that he had conducted thousands of evaluations and found the vast majority to be criminally sane. (Tr. III, 187.) None of the scenarios presented by the prosecutor on cross-examination caused Norris to change his opinion that Petitioner was criminally insane at the time he committed the charged offenses. (Tr. III, 189.)

Petitioner testified that he first became aware of having mental problems on January 1, 2002. (Tr. III, 192.) On that date, Petitioner was in a bar having a couple of beers when he realized that the band was singing songs about him. (Tr. III, 193.) When the drummer gave him a nod, Petitioner walked out of the bar and could hear one bouncer say to another bouncer, "look, he freaked out." (*Id*.) Petitioner previously had his own business, Lautner Positioning. He conducted topographical surveys of cell towers in Michigan and Ohio. (Tr. III, 194.) Petitioner also had a minor son with whom he had regular visits up to 2002. (Tr. III, 193-94.) After the incident in the bar on January 1, 2002, Petitioner began receiving signs. For example, after he left the bar on

January 1, he believed that the music on the radio was telling him that a woman he was dating, Tara Carol, was pregnant with his child and was going to get an abortion. As a result, he stayed up all night driving to different abortion clinics looking for Carol. (Tr. III, 195.) Petitioner found himself following signs almost every day and was only getting a few hours of sleep each night. (Tr. III, 195-96.) Because of the signs, he stopped working and spending time with his son. (Tr. III, 196.)

Petitioner described that on Valentine's Day, he heard church bell's ringing, which he took as a sign to go to the church. (Tr. III, 196.) During the service, the minister told him to go on a journey for forty days and forty nights with nothing but the clothes on his back. (Tr. III, 197.) Petitioner left his bicycle at the church and started running around town following signs. At one point, he sat down on a bench dedicated to Judge McCormick, which he took as a sign that he needed to find Judge McCormick. (Tr. III, 197.) When he went to the courthouse, they told him that McCormick no longer was a judge, which Petitioner took to mean that he had fulfilled his obligation to God. (Tr. III, 198.)

That night, Petitioner woke up and heard cars and traffic going by his window, which he took as a sign of evil. (Tr. III, 198.) Petitioner thought about a song on a CD that he had just bought called "Flee" and saw a bug in his bathroom that looked like a flea and took those as signs that he should flee his apartment. (Tr. III, 198-99.) Petitioner got into his truck and started driving. He believed that other cars were chasing him and egging him on. (Tr. III, 199.) The music playing in his truck told him to drive to New Orleans. Petitioner testified that he hated New Orleans, but he was going because he was told to go there. (*Id*.) Petitioner explained that he began to receive thoughts that "they" were tracking him due to all of the electronics in his truck, so he decided to ditch his truck and go on foot. (Tr. III, 199-200.) He remembers the minister's words about going

with nothing but the clothes on his back, so he abandoned his truck and left everything behind. (Tr. III, 200.) He threw his keys, cigarettes and the contents of his back pack into the woods. He also took $450.00 out of wallet and threw it on the ground. (Tr. III, 200-201.) Petitioner removed his coat and walked into the woods wearing only his shirt and vest. (Tr. III, 201.) As Petitioner walked along a railroad grade, he saw peripheral lights flashing, which he took to be fairies. (*Id*.)

Later, Petitioner saw a light glowing in the forest, which turned out to be a house. (Tr. III, 202.) As he got closer to the house, he was transfixed by the glow that turned into a really bright Jesus Christ. (Tr. III, 202.) Petitioner could see that a man was still up in the house watching television. (Tr. III, 203.) Petitioner believed that he was supposed to talk to the man so he knocked on the door. The man told Petitioner that he'd better go and closed the door. (Tr. III, 203.) Petitioner continued on for a while, but he was very cold and his feet were wet, so he decided to stop following the signs and went back to the house. (Tr. III, 203.) The man did not answer the door, but a short time later, two police officers drove up. Petitioner did not tell them what he was doing because he did not trust them and thought they were clones. (Tr. III, 203.) Petitioner went with the officers voluntarily and they took him to the hospital in Manistee. (Tr. III, 203-04.) After some testing, he was voluntarily admitted to Traverse City Center One for psychiatric treatment. (Tr. III, 204.) He was in the center for five days. (Tr. III, 204.) He was prescribed Risperdal and Ativan, but they did not help him. (Tr. III, 205.)

After his release from Center One, Petitioner continued to receive signs. (Tr. III, 207.) At that point, the signs were telling him to go to Florida. (*Id*.) Petitioner was frightened and had only $120.00, but believed that he must go. (Tr. III, 209.) He packed a backpack and drove to a friend's house, where he left his truck. Petitioner hitchhiked all the way to Florida in less than a

week.  (Tr. III, 210.)  The truckers Petitioner met were Christians and one of them told him about a church in Brownsville, Florida, that was having a seven-year revival.  Petitioner thought that was where God wanted him to go and made that his destination.  (Tr. III, 211.)  After a few days staying at shelters in Florida, Petitioner called his mother.  She was worried about him and told him to come home.  (*Id*.)  After Petitioner returned home, he moved in with Steve Goeke and got a job with Grand Traverse Organic Landscaping.  (Tr. III, 212.)  Petitioner lost his job because he was unable to concentrate due to the signs.  (*Id*.)  Petitioner also was disturbed by his belief that everyone could read his mind.  (Tr. III, 212-13.)

Petitioner testified that he believed that he caused his mother's ovarian cancer.  (Tr. III, 213.)  When she took a turn for the worse, he left town again to see if her condition would improve.  (Tr. IV, 214.)  This time, God was telling him to go to Cadillac, Michigan.  (*Id*.)  Petitioner drove his Jeep to Cadillac and spent the night in a camp ground.  The following day he starting driving south and ended up in Albuquerque, New Mexico.  (Tr. III, 215.)  Petitioner spent a couple of weeks there and worked odd jobs to earn enough money to drive home.  (Tr. III, 216.)  When he returned home, he got a bed at a homeless shelter in Traverse City.  (*Id*.)

With regard to the events of March 15, 2003, Petitioner testified that he had written several plans in his journals.  (Tr. III, 217.)  Petitioner testified that he wanted to die on March 15, 2003.  (Tr. III, 267.)  Petitioner did not know where he was going in the stolen truck, but he decided to head south where it was warm.  (Tr. III, 217.)  Petitioner saw a police officer in Kingsley, Michigan.  (Tr. III, 218.)  He thought that was going to be it and made sure his gun was loaded.  Petitioner stated that the officer looked right at him and waived, which Petitioner construed as a sign that they were proud of him and would not stop him. (*Id*.) At that point, Petitioner decided to jump

off the Mackinac Bridge, so he turned around and started heading north.  He stopped at a store to

buy a pint of bourbon to give him courage.  (*Id*.)  Petitioner chose the Mackinac Bridge because he

had read in the paper about a girl who jumped off the Mackinac Bridge with her baby and believed

that it was his fault.  (Tr. III, 219.)

Petitioner testified that he shot his gun out the truck window at the officers because

he wanted them to shoot back at him, not because he wanted to hurt them.  (Tr. III, 220-21, 278.)

Petitioner claimed that he had access to other guns and ammunition that could have inflicted much

more serious wounds.  (Tr. III, 221.)  When Petitioner got out of the first truck and went into the

woods, he was surprised that the officers did not shoot at him.  (Tr. III, 225.)  When he walked down

into the ravine and did not see any police officers behind him, he took that as a sign that he was

supposed to get away.  (*Id*.)  Petitioner testified that there were signs along the route he took during

the police pursuit that made him think he was on the right path, although there also were times when

he did not get signs.  (Tr. III, 223-24.)  When he saw Mrs. Flynn go down the driveway to her home,

he took that as a sign that he was supposed to take that vehicle (Tr. III, 226), although he ultimately

stole another vehicle from the residence.  Petitioner thought the police had given up and walked to

the Flynn's house.  (*Id*.)  Petitioner told the Flynns he was sorry when he stole the truck from their

house because they seemed like nice people.  (Tr. III, 271.)  Petitioner did not feel that he was

hurting them because he did not point his gun at them.  (*Id*.)

After he left the Flynn's house with the truck, Petitioner saw Officer Devol following

him. (Tr. III, 227.)  Petitioner testified that he stopped and got out of the car because he thought that

it was time for him (Petitioner) to get shot.  (*Id*.)  Petitioner saw that Devol was wearing a police

jacket, but thought that he was off duty since he was driving an unmarked car.  Petitioner also did

not know if Devol had a weapon on him, so he decided to go back to the truck. (Tr. III, 228.) Petitioner denied locking the doors to keep Devol out of the truck. (*Id*.)

When the truck Petitioner stole from the Flynn's home slid into a ditch, he believed that it was time for a shootout with police. (Tr. III, 229.) Petitioner's gun could shoot only one shot at a time and he thought he had only one shot with him. Petitioner grabbed his shotgun, got out of the truck and started walking toward Deputy Griffith. (*Id*.) As Petitioner approached him, Griffith ran around to the passenger side of the car and shot at Petitioner through the windows of the patrol car. (Tr. III, 230.) Petitioner did not realize that he fired a shot until he was driving the police car and saw that his shotgun ejector was jammed. (*Id*.) Griffith shot at Petitioner twelve times at close range and only him hit once in the left thigh. (Tr. III, 231.) Petitioner took that as a sign that he was not supposed to die in a gun fight, although he still intended to go to the Mackinac Bridge. (*Id*.) When Deputy Griffith ran out of ammunition, Petitioner was standing right at the door of his patrol car, so he decided to take it. (Tr. III, 231-32.)

Petitioner stopped at the Berends' house because he wanted a less conspicuous car; he knew the police would be looking for the stolen patrol car. (Tr. III, 232.) Petitioner did not persist in getting the truck from Mr. Berends because Berends told him that the truck was not running and there was a child present. As Petitioner backed out of the driveway, he saw a deputy drive by and then make a U-turn. (*Id*.) There was a police radio in the patrol car he was driving, but all Petitioner could hear was a lady's voice telling him something about "the king is going home." (Tr. III, 233-34.)

After Petitioner was stopped by police in East Jordan, he got out of the car expecting to get shot by police. (Tr. III, 244.) Petitioner acknowledged that the officers would have been

more likely to shoot him if he was armed, but he did not take the gun with him. (Tr. III, 276.) When Petitioner walked several feet without being shot, he tried to go back to the stolen patrol car for his gun so that the police would shoot him. (Tr. III, 244.) Petitioner admitted that he did not say anything about his suicidal thoughts following his arrest, but believed that he was not supposed to talk about what was happening to him. (Tr. III, 269.) The first person Petitioner told about his plan to be killed by police or to jump off the Mackinac Bridge was Dr. Norris, about two months after his arrest. (Tr. III, 277.)

With regard to the incident in the hospital where Petitioner attempted to steal the deputy's gun, Petitioner testified that the deputy brushed up against him several times with his gun. (Tr. III, 281.) In addition, Petitioner claimed that the deputy said, "I'll give you one more chance," which Petitioner took to mean that he had one more chance to kill himself, but he was too slow to react. (Tr. III, 282.) At the time of trial, Petitioner was not receiving signs and was seeing things much more clearly than on the date of the offenses at issue in this case. (Tr. III, 256-58.) Petitioner testified that he was not on medication when he met with Dr. Norris. (Tr. III, 235.) When he talked to Dr. Clark, Petitioner was on Geodon, which was an effective treatment for him. (Tr. III, 205-06, 236.)

Kim Curths testified that she and Petitioner had a ten-year-old son together, but they had not lived together since their son, Trevor, was ten months old. (Tr. IV, 6, 10.) Because of their son, Curths communicated with Petitioner between February 2002 and March 2003. (Tr. IV, 6.) During that time, Curths became concerned about Petitioner having parenting time because he was saying strange things that she did not understand. (Tr. IV, 7-8.) Petitioner told her that he was being called to go places and felt compelled to go. (*Id.*) Before he left for New Mexico, Petitioner told

Curths that he had a third eye. (Tr. IV, 8-9.) Notwithstanding Petitioner's odd behavior, she allowed him to continue having visits with their son. (Tr. IV, 11-12.) Petitioner did not have a regular visitation schedule during that time. He showed up when he wanted to spend time with Trevor, and then took off for Florida or New Mexico because he had been called. (Tr. IV, 15.) Petitioner did not share the full details of the event that resulted in his psychiatric hospitalization in 2002. (Tr. IV, 14-15.) Sometime after he was hospitalized, Curths told Petitioner that he needed help, but Petitioner told her that he could handle it. (Tr. IV, 16.)

Dr. Charles Clark was called by the prosecution as an expert witness in forensic psychology. (Tr. IV, 24.) Clark conducted a forensic examination of Petitioner in September 2003, about six months after the charged offenses were committed. (Tr. IV, 24.) Dr. Clark was aware that Petitioner was taking Geodon, an anti-psychotic drug, at the time he conducted his evaluation. (Tr. IV, 30-31.) As part of his evaluation, Clark reviewed Dr. Norris' report and opinion regarding Petitioner's case. (Tr. IV, 28.) Clark believed that there were more inconsistencies in the version of the events that Petitioner gave to Clark than the version Petitioner gave to Norris. (Tr. IV, 114.) The fact that Petitioner was medicated typically would not prevent him from evaluating Petitioner's condition at the time he committed the charged offenses. (Tr. IV, 30.) When Clark asked Petitioner if he believed the signs or messages that he was receiving were true, Petitioner responded, "I don't know, I believe there was a force." (Tr. IV, 44.) Petitioner understood that he had Schizophrenia, but also continued to believe that his experiences were true. (*Id*.) Petitioner told Clark that he was not thinking about the law on the day he committed the offenses and nothing that he did felt wrong. (Tr. IV, 45.) He thought the police were chasing him because they could read his mind. (*Id*.)

Petitioner told Clark that he did not recall writing the journal passages from March 14 and 15, which concerned activities like stealing a truck and driving to California. (Tr. IV, 46-47.) Petitioner also told Clark that he made journal entries on March 12 and 13 concerning pleasant, encouraging dreams, but the prosecutor ripped those pages out of his journal. (Tr. IV, 45.) When Clark questioned Petitioner about stealing the truck from Williams Chevrolet, Petitioner stated that he did not simply demand the keys from the sales agent because he did not think he would cooperate. (Tr. IV, 50-51.) Petitioner told Clark that he stole the truck because he wanted the police to chase him and shoot him. (Tr. IV, 49-50.) Petitioner took the camping gear because he did not know how far he would get. (Tr. IV, 51-52.) Petitioner said that he took the shotgun because "if they [the police] didn't end it, [he] was going to end it." (Tr. IV, 52.) Petitioner claimed that he dropped down to a very slow speed when he fired the shots at Trooper Wise because he wanted to make it easier for the officer to shoot him. (Tr. IV, 53.) Petitioner could not explain why, if he just wanted to get shot, he did not point an unloaded weapon at a police officer. Petitioner told Clark that it was not his intention to shoot Trooper Wise or Deputy Griffith. (*Id.*)

With regard to the truck Petitioner stole from the Flynn residence, Petitioner denied that he burst into the house or yelled, but told Clark that he carried the shotgun with him "for compliance." (Tr. IV, 54.) At the time, Petitioner believed that the Flynns were there for him and that stealing the truck from them was not wrong. Petitioner admitted telling the Flynns not to call the police because he wanted to get away. (*Id.*) When Clark asked Petitioner why he ran from the police if he wanted to get shot, Petitioner stated that at different points of the chase he thought he was supposed to get away. (*Id.*) Clark also asked Petitioner about his stop at the Berends' residence. Petitioner told Clark that he did not believe that Berends' truck was not working, but

- 30 -

decided to leave after he saw Berends' young son.  (Tr. IV, 55.)  Clark opined that Petitioner's conduct throughout the day showed that he appreciated the wrongfulness of his conduct.  (Tr. IV, 59.)  Clark believed that Petitioner's actions suggested that he was thoroughly focused on the illegality of what he was doing.  (Tr. IV, 60.)

Clark also questioned Petitioner's story that he intended to commit suicide and get shot by police.  (Tr. IV, 61.)  For example, Clark found it inconsistent that Petitioner packed his truck for a trip if he planned to die.  (Tr. IV, 62.)  Clark testified that Petitioner gave he and Dr. Norris differing accounts of the incident involving Detective Devol, the officer driving the unmarked car.  While Petitioner told Norris that he did not recognize Devol as a police officer until after he stopped and saw Devol's police jacket, he told Clark that he identified Devol as a police officer before he stopped, implying that when he stopped and walked back toward's Devol's car, he was inviting gunfire from Devol.  (Tr. IV, 63.)  Petitioner could not explain why he then turned and fled from the scene.  (*Id*.)  Petitioner also could not explain why he got out of the patrol car without his shotgun after he was stopped by police in East Jordan, which likely prevented him from being shot by police officers.  (Tr. IV, 63-64.)  Based upon Petitioner's behavior, Clark did not believe that he ever had any clear deliberated intention to commit suicide.  (Tr. IV, 65.)  To the extent that Petitioner had suicidal thoughts, he never lost enough control that he actually did something that would have accomplished his own death.  (Tr. IV, 64-65.)

Dr. Clark testified that Petitioner appeared to more acutely mentally ill when he was hospitalized at Munson in 2002, than on March 15, 2003.  (Tr. IV, 67-69.)  For example, when Petitioner was hospitalized in 2002, he talked extensively about the delusions that he was having. Clark explained that when a mentally ill person is acutely psychotic, they are more likely to talk

about their delusions because they lose the ability to see that other people will view it as crazy.  In contrast, on March 15, 2003, Petitioner did not talk with anyone that he encountered about his delusions or his alleged intent to die.  (*Id*.)  In addition, Petitioner's writing preceding the incident did not make reference to any signs directing him to do things.  (Tr. IV, 102.)  Petitioner's statement after his arrest that he would be charged with attempted murder for shooting Deputy Griffith was a further indication to Clark that Petitioner understood the illegality of his conduct and understanding of how others view his behavior.  (Tr. IV, 69.)

Clark diagnosed Petitioner as having a Schizophrenia Spectrum Disorder.  (Tr. IV, 70.)  While Petitioner was mentally ill, Clark opined that he was not criminally insane at the time he committed the instant offenses.  (Tr. IV, 72-73.)  Clark believed that Petitioner's own account of what occurred showed that he appreciated the wrongfulness of his conduct.  (Tr. IV, 73.)  Clark also found that Petitioner had the capacity to conform his conduct to the law.  That was demonstrated by Petitioner's ability to control and direct his behavior and to take action aimed at reaching a goal.  (Tr. IV, 74.)  Clark cited several examples, including Petitioner's behavior at the Bill Marsh dealership, where he left after the salesman insisted upon going with him on the test drive of the truck he wanted.  (Tr. IV, 75-76.)  Clark also cited the incident at the Berends' residence where Petitioner left peacefully after he saw the Berends' young son and did not want to expose him to danger.  (Tr. IV, 76.)  According to Clark, Petitioner's last journal entries from March 15 expressed a will to survive, not to commit suicide.  (Tr. IV, 77.)  Clark further opined that even if Petitioner did intend to commit suicide, that would not, in itself, amount to legal insanity.  (Tr. IV, 73.)

The defense called Dr. John Haskins to testify as a rebuttal expert witness in the field of forensic psychiatry. (Tr. IV, 132.) The trial court ruled that Haskins could not give an opinion regarding Petitioner's sanity on the day of the offenses because Haskins had not conducted a full psychiatric evaluation of Petitioner. (Tr. IV, 126-27.) Haksins testified that a mentally ill person can have scepticism about the validity of their delusions and still be criminally insane. (Tr. IV, 139.) He further opined that a person who questions his delusions still may be unable to conform his behavior to the law. (Tr. IV, 140.) Haskins testified that delusions affect perception and may or may not affect memory. (Tr. IV, 140-141.) According to Haskins, self-preservation is a strong human instinct and a person can act to protect himself and still be criminally insane. (Tr. IV, 141.) Haskins explained that mental illness is cyclical, so that a person can have periods of being better or worse. (Tr. IV, 142-43.) He testified that a mentally ill person can exercise logic, but it may be based upon a misperception. (Tr. IV, 143.) Haskins also stated that pain can cause a mentally ill person to become more focused and clear for a period of time. (Tr. IV, 138.)

At the conclusion of trial, on June 18, 2004, the jury found Petitioner guilty as charged with eleven felony offenses, with the exception of Count 3, for which Petitioner was convicted of the lesser offense of assault with a dangerous weapon, rather than assault with intent to murder. (Tr. V, 25.) On August 3, 2004, Petitioner was sentenced as a second habitual offender to the following periods of imprisonment: 36 to 90 months for Count 1 (unlawfully taking or possession of a motor vehicle), 36 to 90 months for Count 2 (third-degree fleeing and eluding), 30 to 72 months for Count 3 (assault with the intent to commit great bodily harm), 2 years for Count 4 (felony-firearm), 14 to 30 years for Count 5 (first-degree home invasion), 20 to 40 years for Count 6 (armed robbery), 20 to 40 years for Count 7 (carjacking), 2 years for Count 8 (felony-firearm), 20 to 40 years for Count 9 (assault with the intent to commit murder), 20 to 40 years for Count 10

(carjacking), and 2 years for Count 11( felony-firearm). In addition, Petitioner was ordered to make payments totaling $13,945.03. (Sentencing Transcript, 82-89, docket #26.)

### B. Direct Appeal

Petitioner appealed as of right to the Michigan Court of Appeals. His appellate counsel filed a brief raising the following claims of error:

I. WAS DEFENDANT DEPRIVED OF EFFECTIVE ASSISTANCE OF COUNSEL WHERE EXPERT TESTIMONY WAS PRESENTED THAT DEFENDANT LACKED SUBSTANTIAL CAPACITY TO APPRECIATE THE NATURE AND QUALITY OR THE WRONGFULNESS OF HIS CONDUCT, BUT THAT DEFENDANT COULD CONFORM HIS CONDUCT TO THE REQUIREMENTS OF THE LAW, AND COUNSEL ARGUED ONLY THAT DEFENDANT COULD NOT CONFORM HIS CONDUCT TO THE REQUIREMENTS OF THE LAW AND DID NOT ARGUE THAT DEFENDANT LACKED SUBSTANTIAL CAPACITY TO APPRECIATE THE NATURE AND QUALITY OR THE WRONGFULNESS OF HIS CONDUCT.

II. WAS DEFENDANT DENIED A FAIR TRIAL BY THE PROSECUTOR'S MISCONDUCT IN CROSS-EXAMINATION OF DEFENDANT IMPLYING THAT A VERDICT OF NOT GUILTY BY REASON OF INSANITY WOULD RESULT IN HIM BEING SET FREE.

III. DI D THE SENTENCING JUDGE ERR REVERSIBLY BY ORDERING ONE OF DEFENDANT'S FELONY-FIREARM SENTENCES (COUNT 11) TO BE SERVED CONSECUTIVELY WITH BOTH THE SENTENCE FOR ASSAULT WITH INTENT TO MURDER (COUNT 9) AND CARJACKING (COUNT 10), WHERE THOSE TWO SENTENCES WERE ORDERED TO BE SERVED CONSECUTIVELY, BASED ON THE JURY'S VERDICT FINDING DEFENDANT GUILTY OF POSSESSING OF A FIREARM DURING THE COMMISSION OF "ASSAULT WITH INTENT TO MURDER AND OR CARJACKING."

IV. DID THE SENTENCING COURT ERR REVERSIBLY BY IMPOSING A SENTENCE OF 14-40 YEARS FOR HOME INVASION IN THE FIRST DEGREE AS AN HABITUAL OFFENDER (2ND FELONY) WHERE THE LONGEST MAXIMUM SENTENCE ALLOWED BY STATUTE IS 30 YEARS.

(Def.-Appellant's Br. on Appeal, docket #1-2.) Petitioner subsequently filed a *pro se* supplemental

brief raising the following additional claims:

> I.A.    WERE DEFENDANT'S FIFTH, SIXTH, AND FOURTEENTH AMENDMENT RIGHTS VIOLATED WHEN HIS TRIAL ATTORNEY FAILED TO HAVE THE CLINICIAN OF HIS CHOICE PERFORM A FULL PSYCHIATRIC EVALUATION.
>
> I.B.    WAS DEFENDANT DEPRIVED OF EFFECTIVE ASSISTANCE OF COUNSEL WHEN HIS TRIAL ATTORNEY FAILED TO HAVE THE CLINICIAN OF DEFENDANT'S CHOICE PERFORM A FULL PSYCHIATRIC EVALUATION.
>
> II.    WERE DEFENDANT'S FIFTH, SIXTH, AND FOURTEENTH AMENDMENT RIGHTS VIOLATED WHEN THE TRIAL JUDGE RULED THAT AN EXPERT WITNESSE'S [SIC] TESTIMONY AT TRIAL BE LIMITED TO EXCLUDE HIS OPINIONS OF DEFENDANT'S STATE OF MIND AT THE TIME OF THE INSTANT OFFENSE.
>
> III.    WAS THE PROSECUTION'S TAMPERING OF [SIC] EVIDENCE A VIOLATION OF DEFENDANT'S FIFTH, SIXTH, AND FOURTEENTH AMENDMENT RIGHTS.

(Def.-Appellant's Supp. Br. on Appeal, docket #29.) Appellate counsel also filed a motion to

remand, which was denied by the Michigan Court of Appeals on May 19, 2005. (*See* May 19, 2005

Mich. Ct. App. Ord., docket #29.) By unpublished opinion issued on December 29, 2005, the

Michigan Court of Appeals rejected all appellate arguments and affirmed Petitioner's convictions

and sentences. (*See* 12/29/05 Mich. Ct. App. Opinion ("MCOA Op."), docket #29.)

Petitioner filed a *pro per* application for leave to appeal to the Michigan Supreme

Court. Petitioner raised the first two claims raised by appellate counsel on direct appeal as well as

the three claims raised in his supplemental brief. By order entered May 30, 2006, the Michigan

Supreme Court denied Petitioner's application for leave to appeal because it was not persuaded that

the questions presented should be reviewed. (*See* Mich. Ord., docket #30.)

**Standard of Review**

This action is governed by the Antiterrorism and Effective Death Penalty Act, PUB. L. 104-132, 110 STAT. 1214 (AEDPA). *See Penry v. Johnson*, 532 U.S. 782, 792 (2001). The AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law. *Bell v. Cone*, 535 U.S. 685, 693-94 (2002). The AEDPA has "drastically changed" the nature of habeas review. *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001). An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d).

The AEDPA limits the source of law to cases decided by the United States Supreme Court. 28 U.S.C. § 2254(d). This Court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court. *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey*, 271 F.3d at 655. In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts. *Bailey*, 271 F.3d at 655; *Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000). The inquiry is "limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time [the petitioner's] conviction became final." *Onifer v. Tyszkiewicz*, 255 F.3d 313, 318 (6th Cir. 2001).

A decision of the state court may only be overturned if (1) it applies a rule that contradicts the governing law set forth by the Supreme Court, (2) it confronts a set of facts that are

materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a different result; (3) it identifies the correct governing legal rule from the Supreme Court precedent but unreasonably applies it to the facts of the case; or (4) it either unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend a principle to a context where it should apply. *Bailey*, 271 F.3d at 655 (citing *Williams*, 529 U.S. at 413); *see also Bell*, 535 U.S. at 694; *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003). A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 411; *accord Bell*, 535 U.S. at 699. Rather, the issue is whether the state court's application of clearly established federal law is "objectively unreasonable." *Williams*, 529 U.S. at 410.

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Lancaster*, 324 F.3d at 429; *Bailey*, 271 F.3d at 656. This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989).

**Discussion**

I.      **Ineffective Assistance of Counsel: Ground I**

Petitioner's claim of ineffective assistance of counsel concerns his insanity defense. Under Michigan law, a defendant in a criminal proceeding is presumed sane. *People v. Murphy*, 331 N.W.2d 152, 157 (Mich. 1982). Therefore, the prosecutor need not establish the defendant's sanity nor present any evidence on that issue. *People v. Jones*, 390 N.W.2d 189, 191 (Mich. Ct. App. 1986). Rather, the defense must propose to establish legal insanity at the time of the charged offense. MICH. COMP. LAWS § 768.20a. "It is an affirmative defense to a prosecution for a criminal offense that the defendant was legally insane when he or she committed the acts constituting the offense." MICH. COMP. LAWS § 768.21a(1). An individual is legally insane if he proves, as a result of mental illness as defined in the mental health code,[3] that he lacked the substantial capacity to appreciate the nature and quality or the wrongfulness of his conduct or lacked the ability to conform his conduct to the requirements of the law. *People v. Carpenter*, 627 N.W.2d 276, 280 (Mich. 2001); MICH. COMP. LAWS § 768.21 a(1). By statute, MICH. COMP. LAWS § 768.21 a(3), the defendant has the "burden of proving the defense of insanity by a preponderance of the evidence." *See also Carpenter,* 627 N.W.2d at 280. A defendant can be found guilty of an offense because of a mental illness, but not be deemed legally insane at the time the offense was committed. *Id.*

In this case, both Dr. Norris and Dr. Clark testified that Petitioner was mentally ill at the time he committed the offenses. The only issue in contention was whether Petitioner's mental illness met the additional requirement that defendant lacked substantial capacity either to appreciate

---

[3]"Mental illness" means a substantial disorder of thought or mood that significantly impairs judgment, behavior, capacity to recognize reality, or ability to cope with the ordinary demands of life. MICH. COMP. LAWS § 330.1400(g).

the nature and quality or the wrongfulness of his conduct, or to conform his conduct to the requirements of the law. The defense expert, Dr. Norris, testified that Petitioner was able to conform his conduct to the law, but lacked the capacity to understand the wrongfulness of his conduct. The expert for the prosecution, Dr. Clark, concluded that Petitioner did not meet either standard for criminal insanity. In closing arguments, defense counsel abandoned Dr. Norris' theory and argued that the jury should find Petitioner not guilty by reason of insanity because he was unable to conform his conduct to the law. Petitioner contends in his first ground for habeas corpus relief that his trial counsel's decision to depart from Dr. Norris' theory and argue that Petitioner could not conform his conduct to the requirements of the law, was objectively unreasonable and caused the jury to reject his insanity defense.

A claim of ineffective assistance of counsel must be evaluated under the two-prong test set forth by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). To establish a claim of ineffective assistance of counsel, the petitioner must prove: (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome. A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. The defendant bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy. *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *see also Nagi v. United States*, 90 F.3d 130, 135 (6th Cir. 1996) (holding that counsel's strategic decisions were hard to attack). The court must determine whether, in light of the circumstances as they existed at the time of counsel's actions, "the identified acts or omissions were outside the wide range of

professionally competent assistance." *Strickland*, 466 U.S. at 690. Even if a court determines that

counsel's performance was outside that range, the defendant is not entitled to relief if counsel's error

had no effect on the judgment. *Id.* at 691. A claim of ineffective assistance of counsel presents a

mixed question of law and fact. Accordingly, the Court must apply the "unreasonable application"

prong of § 2254(d)(1). *See Barnes v. Elo*, 339 F.3d 496, 501 (6th Cir. 2003).

The Michigan Court of Appeals first found that Petitioner waived his right to seek

appellate review of the propriety of his trial counsel's closing argument because Petitioner stated

on the record that he was satisfied with the argument his trial counsel presented to the jury and did

not wish to make his own closing statement.[4] The court of appeals further concluded that even if

Petitioner had not waived his claim of error, he failed to overcome the presumption that his trial

counsel's decision to argue that Petitioner was unable to conform his conduct to the requirements

of the law was anything other than sound trial strategy. In reaching that conclusion, the court of

appeals reasoned:

> At trial, defendant's expert in forensic psychology, Dr. Steven Norris, testified that, while defendant was able to conform his conduct to the requirements of the law, because defendant was under the delusion that God directed his actions, he did not appreciate the wrongfulness of his conduct. On cross-examination, the prosecutor repeatedly noted examples of defendant's behavior that appeared to be inconsistent with Norris' conclusions. Norris stated that the fact that defendant knew how people would react did not alter his opinion that defendant could not appreciate the wrongfulness of his conduct. He explained,
>
> > Yes, in terms of – that's part of it, you know, that this was – he's going to be judged for this, there's going to be these kind[s] of consequences. But in my opinion he still thought that this is what he had been directed, you know, by God to do and was the right thing to

---

[4]The Michigan Court of Appeals stated that because Petitioner did not raise his claims of ineffective assistance of counsel before the trial court in a motion for new trial or for an evidentiary hearing, the court of appeals' review was limited to mistakes apparent on the record. (MCOA Op. 2.) The court of appeals noted that Petitioner moved for a remand on the issue in that court, but his motion was denied. (MCOA Op. 2 n.1.)

do. Still, he knew that people would react this way, that there would be these kinds of repercussions by society and so on.

In addition to the evidence that defendant understood the wrongfulness of his conduct, the prosecutor placed much weight on the fact that defendant's actions did not seem to comport with his stated motive that he was on a suicide mission on the day in question. When the prosecutor questioned Norris about defendant's suicide plans and noted that the events of the day presented numerous opportunities for defendant to get himself killed, Norris admitted that defendant "did not commit suicide or set himself up definitively to be killed when he could have."

To rebut Norris' testimony, plaintiff called its own expert, Dr. Charles Clark. Clark testified that defendant's use of deceit, subterfuge and force indicated a clear awareness that he understood that what he was doing was wrong. Clark used the home invasion and theft of Benjamin Flynn's truck to explain this logic.

If [defendant] had believed that he had a legitimate right to this, that there was nothing wrong with it, there would be no presumed reason to use force or threat in order to secure the truck. He didn't do that. He said he included the shotgun for compliance, indicating again, a clear awareness that the Flynn[]s would not comply if he was to walk into their house and simply demand the keys to the truck.

Clark further disregarded defendant's claim that he wasn't thinking about whether his actions were right or wrong under the law, but rather "was following God's law."

The actions actually suggest rather strongly that he was thoroughly focused on the law and the illegality of what he was doing. The whole claim he made, and I'll put it in those terms, it was a claim that the purpose of this trip, this chase was to commit suicide by cop, it is a claim that is – that has as it's basis an awareness that the cops will shoot at you if you're doing something illegal. So, he had to know that what he was doing was illegal. He had to appreciate that what he would be doing would be seen as wrong in order to obtain what he claimed he wanted, namely to get shot by the cops.

Clark also found it significant that defendant told an officer shortly after he was arrested that he would likely be charged with attempted murder. Clark said, "That's a clear indication that at that moment he understood . . . how that act was viewed by society, by the law. . . . It's insight; it's awareness of how others see his behavior." From this, Clark concluded that defendant "did not lack that substantial ability to appreciate the nature, and quality, and wrongfulness of his acts."

Clark also opined that the evidence indicated that defendant was also capable of conforming his conduct to the requirements of the law. Clark noted that defendant's ability to control his actions at the Bill Marsh dealership and the Berends' residence exemplified his ability to conform his conduct to the requirements of the law. In both cases, defendant was deterred from doing an illegal act by ordinary circumstances. Clark testified that the fact that defendant did not single-mindedly pursue his goals indicated that he was in good control of his actions.

During closing arguments, defendant's trial counsel abandoned any attempt to argue that defendant did not appreciate the nature and quality or the wrongfulness of his actions, but rather concentrated his argument on the theory that, because defendant felt compelled by signs from God, he could not conform his conduct to the requirements of the law. While this argument contradicted Norris' interpretation of defendant's conduct, it was consistent with portions of Norris' testimony and was reasonable in light of the totality of the evidence.

Defendant repeatedly made comments and took actions, which indicated that he was fully aware of the wrongfulness of his conduct and the potential repercussions. Bonnie and Benjamin Flynn both testified that defendant apologized after taking Benjamin's truck. If defendant did not appreciate the wrongfulness of his conduct he would not need to apologize. Likewise, defendant repeatedly asserted that he took many of the actions that he did in order to get the police officers to shoot and kill him. As Clark noted, defendant had to understand that the officers would not shoot him unless he engaged in unlawful conduct. In addition, after defendant was captured, he told one officer that he believed he would be charged with assault with the intent to commit murder and to another officer he characterized his taking of vehicles as "stealing." Indeed, defendant wrote a journal entry that stated that he intended to steal a Dodge Dakota and when asked why he wanted to take a truck from the dealership, defendant replied that he did not think his Jeep could outrun the police. Finally, defendant told Clark that he got back into the stolen police car and left the Berends' residence because he saw Berends' son and did not want him to be around that kind of activity. Consequently, there was extensive evidence that defendant appreciated the nature and quality or the wrongfulness of his conduct.

On the other hand, Norris testified that, while under the delusion of his mental illness, defendant engaged in ad hoc reasoning where he would have a thought and then observe a sign that would either confirm the validity of the thought or point him in another direction. This interpretation of defendant's illness is supported by defendant's history of mental illness, journal entries and statements. Defendant testified that he thought the failure of the police officers to pursue him further into the woods was a sign that he was to get away. He also stated that he thought seeing Bonnie Flynn driving up to her home was a sign that

he should take her car. Defendant also interpreted the fact that the Blue Ford got stuck as a sign that it was time for a shootout with the police and Griffith's failure to kill him after firing so many shots was a sign that he was not supposed to die. In addition, defendant's journals and prior history of mental illness all confirm that defendant has in the past felt compelled to embark on impromptu journeys and engage in erratic behavior based on signs. Hence, the evidence supported defendant's trial counsel's argument that, although defendant knew what he was doing was wrong, because of his mental illness, he was under the belief that he had no choice but to follow these signs. Furthermore, this argument had the added benefit of explaining why defendant might conform to the requirements imposed by society and the law in one situation and ignore the requirements in a different situation. Where defendant lacked a sign, he could conform his behavior to the law; however, where defendant had a sign, he felt compelled to follow the action dictated by the sign.

Although Norris' explanation could still have been argued, after the prosecution's effective cross-examination of Norris and the rebuttal testimony by Clark, one might readily conclude that Norris' ultimate conclusion would carry very little weight with a jury. Given this situation, defendant's trial counsel had to decide whether to continue to argue a position that seemed to have overwhelming evidence against it or argue a position that contradicted the conclusion proffered by his own expert, but was otherwise consistent with the totality of the evidence. Because defendant's trial counsel's decision to take the latter course was supported by the evidence and reasonable under the totality of the circumstances, defendant has failed to overcome the strong presumption that his counsel was effective. *People v Solmonson*, 261 Mich App 657, 663; 683 NW2d 761 (2004). The fact that defendant's trial counsel's decision proved to be wrong does not by itself cause the choice to use the argument to be below an objective standard of reasonableness. Rather, the question is whether counsel's decision fell within the range of competence demanded of attorneys in criminal cases. *People v Haynes* (After Remand), 221 Mich App 551, 558; 562 NW2d 241 (1997). Therefore, defendant's trial counsel's closing argument does not fall below an objective standard of reasonableness.

(MCOA Op. 2-5.)[5]

---

[5]Respondent contends that Petitioner procedurally defaulted Grounds I, III and IV in the Michigan state courts. The Supreme Court has held that federal courts are not required to address a procedural-default issue before deciding against the petitioner on the merits. *See Hudson v. Jones*, 351 F.3d 212, 216 (6th Cir. 2003) (citing *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997) ("Judicial economy might counsel giving the [other] question priority, for example, if it were easily resolvable against the habeas petitioner, whereas the procedural-bar issue involved complicated issues of state law."), and *Nobles v. Johnson*, 127 F.3d 409, 423-24 (5th Cir. 1997) (deciding against the petitioner on the merits even though the claim was procedurally defaulted)). *See also* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."). Where the procedural default issue raises more questions than the case on the merits, the

As set forth in the Michigan Court of Appeals' thorough and well reasoned analysis, the prosecutor effectively elicited testimony throughout the trial showing that Petitioner understood the wrongfulness of his conduct on March 15, 2003. For example, on cross-examination of Dr. Norris, the prosecutor presented several examples of behavior that appeared inconsistent with Norris' theory. Norris responded that Petitioner was aware of how people would respond to him, but his actions were being directed by God. Norris explained:

> I guess the issue is the ability to appreciate wrongfulness. While Dr. Clark and I would both be aware that, you know, the Defendant did such things as, you know, cutting phone lines and telling people not to call the police and running from the police and doing things like that in one sense point toward a certain element of appreciation of wrongfulness, in my opinion, the difference from my perspective was that, again, he knew how people would react and so on and he was not retarded or delirious, but his motivation was psychotic, he was doing things for delusional reasons, that he was being directed by God and so on and that he thought what he was doing was the right thing.

(Tr. III, 142-43.) Norris conceded that for the most part, Petitioner's behavior on March 15 was not consistent with his alleged motive to get shot by police, but believed that Petitioner had mixed motives regarding whether he wanted to die. (Tr. III, 168, 172.) Norris also agreed that Petitioner made calculated, goal-oriented decisions throughout the day, but believed that the delusion motivated his conduct. (Tr. III, 182.)

The prosecutor then called its own expert, Dr. Clark, who testified that Petitioner was not legally insane because he both understood the wrongfulness of his conduct and could conform his conduct to te law. With regard to Petitioner's ability to appreciate the wrongfulness of his

---

Court may assume without deciding that there was no procedural default or that Petitioner could show cause and prejudice for that default. *See Cone v. Bell*, 243 F.3d 961, 971 (6th Cir. 2001), *rev'd on other grounds*, *Bell v. Cone*, 535 U.S. 685 (2002); *Binder v. Stegall*, 198 F.3d 177, 178 (6th Cir. 1999). Because Petitioner's claims are without merit, the Court will assume without deciding that Grounds I, III and IV are not procedurally defaulted.

conduct, Dr. Clark discussed numerous instances where Petitioner's actions demonstrated his awareness that what he was doing was wrong. Most notably, Clark cited Petitioner's admitted use of a gun to obtain compliance when he stole the truck from the Flynn residence, Petitioner's decision to leave the Berends' residence after he saw the Berends' young son, and Petitioner's comment after he was apprehended that he would be charged with attempted murder for shooting Deputy Griffith. (Tr. IV, 54-55, 69, 76.) Clark concluded that Petitioner's conduct throughout the day suggested that he was completely aware of the illegality of what he was doing. (Tr. IV, 60, 73.)

In light of the evidence presented at trial, defense counsel was faced with the dilemma of continuing to argue Dr. Norris' theory that Petitioner did not understand the wrongfulness of his conduct or offering the alternative theory that Petitioner could not conform his conduct to the law because he was being directed by God. The alternative theory arguably was more credible under the totality of the evidence and, thus, had a better chance of success before the jury. The theory offered by defense counsel still was supported by Norris' testimony that Petitioner was aware of cause and effect and how people would react to him, but believed that he was acting in accordance with God's will. (Tr. III, 135, 142-43; 165.) Petitioner cannot overcome the strong presumption that counsel's decision to change course in his closing argument was sound trial strategy. *Strickland*, 466 U.S. at 689. The *Strickland* Court cautioned that courts must take care to avoid "second-guess [ing]" strategic decisions that did not prove successful. *Id.* at 689. "A strategic decision cannot be the basis for a claim of ineffective assistance unless counsel's decision is shown to be so ill-chosen that it permeates the entire trial with obvious unfairness." *Hughes v. U.S.*, 258 F.3d 453, 457 (6th Cir. 2001). When faced with a theory that was overwhelmingly contradicted by the evidence that had been developed and presented at trial, counsel made a reasonable strategic

decision to offer a theory in closing arguments that was more consistent with the totality of the evidence. Accordingly, the decision of the Michigan Court of Appeals is not an unreasonable application of *Strickland*.

## II. Prosecutorial Misconduct: Ground II

In his second ground for relief, Petitioner contends that he was denied a fair trial when the prosecutor, during his cross-examination of Petitioner, implied that a verdict of not guilty by reason of insanity would result in Petitioner being set free. Petitioner elected to testify at trial on his own behalf. On cross-examination, the prosecutor began to question Petitioner about his current understanding regarding the wrongfulness of his prior actions. During this exchange, Petitioner acknowledged that taking a truck without permission, fleeing from the police, shooting at a police officer, and entering someone else's home without permission would be criminal acts. The prosecutor then asked:

> Q: Now, I find it interesting, Mr. Lautner, isn't the – your entire presentation in this trial to try to convince this group of people that as of the 15th of March that they shouldn't hold you accountable for doing all of those things that you agree were crimes?
>
> A: Yes.
>
> Q: You want them to let you go, don't you?
>
> A: I --

(Tr. III, 259.) Defense counsel objected and the trial court upheld the objection on the basis that the form of the question was improper. (Tr. III, 260.) The trial court sustained the objection and the prosecutor asked:

> Q: Mr. Lautner, what you're hoping for is a verdict of not guilty or not guilty by reason of insanity, that's what you're hoping for out of these proceedings, isn't that right?

A:     That is correct, but if I was --

Q:     Excuse me, Mr. Lautner, when you finish answering a question just please wait for me to ask another one.

COUNSEL:          You Honor, I would object. I think it's up to the Court to admonish the witness, not the prosecution.

THE COURT:        Well, that's correct.

THE WITNESS:      He brought it up, Your Honor. I'd like to -- he made the comment that I would be getting off Scott free if I am found not guilty by reason of insanity.

THE COURT:        I didn't hear that comment at all from anybody.

PROSECUTOR:       Well, neither did I and, Judge, I believe he had finished answering my question and I was entitled to ask him another question.

THE COURT:        Yeah, move on to a new question, please.

CROSS-EXAMINATION CONTINUED BY PROSECUTOR:

Q:     So, Mr. Lautner, you are, if I understand your position, accepting no responsibility for what happened, taking that truck from Williams Chevrolet till you were apprehended in East Jordan, you're accepting no responsibility for that, isn't that true?

(Tr. III, 260-61.) Defense counsel continued to object and the trial court eventually ruled in favor of the defense, stating "Well, that does go to the ultimate issue and it's really more for the jurors, Mr. Donnelly [the prosecutor]. I guess you can ask about his other facts, if you would." (Tr. III, 262.) Later, the prosecutor asked:

Q:     So, you knew you had stolen that police car?

A:     I had stolen it, yes.

- 47 -

Q:    But you don't want to be held accountable for it, do you?

(Tr. III, 270.)  Defense counsel raised another objection on the ground that the prosecutor was asking questions about an issue that was for the jury to decide.  The trial court agreed and sustained the objection.  (Tr. III, 271.)

In order for a petitioner to be entitled to habeas relief on the basis of prosecutorial misconduct, the petitioner must demonstrate that the prosecutor's improper conduct "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"  *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).  "[T]he touchstone of due process analysis . . . is the fairness of the trial, not the culpability of the prosecutor."  *Smith v. Phillips*, 455 U.S. 209, 219 (1982).  In evaluating the impact of the prosecutor's misconduct, a court must consider the extent to which the claimed misconduct tended to mislead the jury or prejudice the petitioner, whether it was isolated or extensive, and whether the claimed misconduct was deliberate or accidental.  *See United States v. Young*, 470 U.S. 1, 11-12 (1985).  The court also must consider the strength of the overall proof establishing guilt, whether the conduct was objected to by counsel and whether a curative instruction was given by the court.  *See id.* at 12-13 (1985); *Darden*, 477 U.S. at 181-82; *Donnelly*, 416 U.S. at 646-47; *Berger v. United States*, 295 U.S. 78, 84-85 (1935).

The two judge majority of the Michigan Court of Appeals found that the prosecutor's line of questioning was improper, but concluded that the prosecutor's conduct did not affect the outcome of the trial:

It is generally inappropriate for a prosecutor to refer to the ultimate disposition of the defendant after a verdict is rendered. *People v Wallace*, 160 Mich App 1, 6-8; 408 NW2d 87 (1987). Likewise, it is improper for a prosecutor to seek to capitalize on a jury's fear that the defendant will be set free if it returns an insanity

- 48 -

verdict. *People v Staggs*, 85 Mich App 304, 310; 271 NW2d 211 (1978). While the prosecutor did not directly comment on defendant's ultimate disposition if found not guilty by reason of insanity, his comments that defendant's "presentation" (i.e. his insanity defense) was merely an attempt "to convince this group of people that . . . they shouldn't hold you accountable for doing all of those things that you agree were crimes[,]" which was immediately followed by the question "you want them to let you go, don't you?" implicates defendant's ultimate disposition if found not guilty by reason of insanity. Hence, this line of questioning was inappropriate.

Even though this line of questioning was inappropriate, reversal will only be warranted where it affirmatively appears that it is more probable than not that the error was outcome determinative. *Brownridge, supra* at 216. Defendant argues that the fact that the jury found defendant guilty rather than guilty but mentally ill, despite the overwhelming evidence that he was mentally ill, is proof that these inappropriate questions influenced the jury's verdict and, therefore, were not harmless. We do not agree.

While it is true that both plaintiff's expert and defendant's expert concluded that defendant was mentally ill, the jury was free to disregard the expert testimony and draw its own conclusions from the evidence and lay testimony. *People v Murphy*, 416 Mich 453, 465; 331 NW2d 152 (1982); *People v Renno*, 392 Mich 45, 60; 219 NW2d 422 (1974); see also CJI2d 5.10. In fact, the trial court specifically instructed the jury that it did not have to believe an expert's opinion. In addition, Clark testified about the cyclical nature of mental illness and specifically noted that the evidence indicated that defendant's condition had improved by the time of the incidents in question. Along with this testimony, the jury heard extensive testimony concerning defendant's behavior on the day in question and, from this testimony alone, could have concluded that defendant had not proved that it was more likely than not that he was suffering from "a substantial disorder of thought or mood that significantly impair[ed] [his] judgment, behavior, capacity to recognize reality, or ability to cope with the ordinary demands of life," on the day in question. MCL 330.1400(g).

Furthermore, the inappropriate questioning was not particularly prejudicial. Unlike the case in *Wallace, supra* at 7-8, the prosecutor in this case did not directly comment to the jury that defendant would get released if he were found not guilty by reason of insanity and, after just a few questions of this nature, the trial court intervened and asked the prosecutor to move on to questions regarding the facts. Finally, jurors are presumed to follow their instructions, *People v Graves*, 458 Mich 476, 486; 581 NW2d 229 (1998), and the trial court instructed the jury that the lawyers questions are not evidence and that possible penalties should not influence its decision. Hence, after examination of the entire cause, it is not more probable than not that these comments affected the outcome of the trial. *Brownridge, supra* at 216. Therefore, a new trial is not warranted on this basis.

- 49 -

(MCOA Op. 7-9.)  The third judge on the Michigan Court of Appeals panel dissented on the issue of prosecutorial misconduct because he did not believe that the prosecutor's conduct was improper.

The Sixth Circuit previously has applied Supreme Court precedent from *Donnelly* and *Darden* in considering whether a prosecutor's denigration of the legally viable defense of insanity constituted prosecutorial misconduct.  *See Gall v. Parker*, 231 F.3d 265, 311-312 (6th Cir. 2000); *overruled on other grounds by Bowling v. Parker*, 344 F.3d 487, 501 n.3 (6th Cir. 2003).  During closing argument, the prosecutor in *Gall* significantly misrepresented the psychological evidence and disparaged the possibility that psychological evidence may ever be worthy of belief. *Id.* at 312-13.

The prosecutor also warned that Gall would go free if found not guilty for reason of insanity. During his closing, the prosecution stated:

> "Now folks are we going to turn [Gall] loose on society by reason of insanity[?]" J.A. at 1588-89. Seconds later, he repeated: Gall "cannot escape the ends of justice by retreating within the safety of his own skull!" J.A. at 1589. At another point, the [prosecutor] stated that if the jury were to believe Dr. Toppen's testimony, "then turn him loose."

*Id.* at 315.

The Sixth Circuit found that the prosecutor's remarks "comprised part of a broader strategy of improperly attacking Gall's insanity defense by criticizing the very use of the defense itself, rather than addressing its evidentiary merits head on." *Gall*, 231 F.3d at 313.  The court noted that "[c]ourts have long castigated prosecutors when their efforts to rebut an insanity defense constitute no more than an attack on the rationale and purpose of the insanity defense itself." *Id*. In reaching its conclusion that the prosecutor's remarks violated due process, the *Gall* court

- 50 -

recognized that, in a case raising the insanity defense, a prosecutor is entitled to vigorously attack

the defense.  However,

> because ours is a system of law, the arsenal available to a prosecutor to achieve that
> legitimate goal is limited to arguments rooted in properly introduced evidence and
> testimony rather than words and tactics designed to inflame passions, air
> unsubstantiated prosecutorial beliefs, and downplay the legitimacy of a legally
> recognized defense.

*Id.* at 316.  In light of the extensiveness of the prosecutor's comments and his suggestion that the

defendant would go free if found not guilty, the court granted habeas corpus relief.  *Id.*

This case does not present the same type of egregious conduct that occurred in *Gall*.

First, this case concerns a line of questioning during the prosecutor's cross-examination of

Petitioner, not comments made by the prosecutor during closing arguments.  The prosecutor did not

explicitly state or intimate that Petitioner would be released upon a verdict of not guilty by reason

of insanity.  The only direct comment that Petitioner would be released if found by the jury to be

criminally insane was Petitioner's own unsolicited statement to the trial court that "he [the

prosecutor] made the comment that I would be getting off Scott free if I am found not guilty by

reason of insanity."  (Tr. III, 261.)  Moreover, the prosecutor's questions were not intended to incite

passions or prejudices of the jurors.  Rather, viewed in context, the prosecutor's questions were

intended to show that Petitioner understood the wrongfulness of his conduct at the time he

committed the offenses, but did not want to accept responsibility for those actions.

Assuming, as the Michigan Court of Appeals did in this case, that the prosecutor's

line of questioning, particularly the question, "you want them to let you go, don't you?," improperly

implicated Petitioner's ultimate disposition if found not guilty by reason of insanity, the prosecutor's

questions did not so infect the trial with unfairness as to violate Petitioner's due process rights.  *See*

*Darden*, 477 U.S. at 181; *Donnelly*, 416 U.S. at 643. As discussed by the Michigan Court of Appeals, the prosecutor did not directly comment to the jury that Petitioner would be released if he was found not guilty of reason of insanity. In addition, the trial court sustained the defense objections to the prosecutor's line of questioning and asked the prosecutor to move on to a different line of questioning. Furthermore, federal courts generally "presume that juries follow their instructions." *Washington v. Hofbauer*, 228 F.3d 689, 706 (6th Cir. 2000). Here, the trial court instructed the jury that the lawyers questions are not evidence and that possible penalties should nor influence its decision. (Tr. IV, 220 .)

Moreover, the jury heard extensive testimony regarding Petitioner's behavior on the day he committed the offenses and could have concluded from that testimony that Petitioner failed to show by a preponderance of the evidence that he was mentally ill, i.e., that he suffered from a substantial disorder of thought or mood that significantly impaired his judgment, behavior, capacity to recognize reality, or ability to cope with the ordinary demands of life. *See* MICH. COMP. LAWS § 330.1400(g). Petitioner, therefore, cannot show that but for the prosecutor's questions, the jury would have returned a verdict of guilty but mentally ill or not guilty by reason of insanity. Accordingly, the decision of the Michigan Court of Appeals, that the prosecutor's line of questioning was improper but harmless, was a reasonable application of Supreme Court precedent.

III.     **Trial Counsel's failure to request a full psychiatric evaluation by a clinician of Petitioner's choice: Grounds III and IV**

In his third ground for habeas corpus relief, Petitioner claims that his Fifth, Sixth and Fourteenth Amendment rights were violated when defense counsel failed to request a full psychiatric evaluation by a clinician of Petitioner's choice. In Ground IV, Petitioner makes a related claim that

he was denied the effective assistance of counsel when defense counsel failed to request a full psychiatric evaluation by a clinician of Petitioner's choice.

Petitioner first was evaluated by Dr. Norris from the Center for Forensic Psychiatry, who concluded that Petitioner was criminally insane at the time he committed the offenses. The prosecutor then retained Dr. Clark, who conducted a second examination and concluded that Petitioner was mentally ill when he committed the offenses, but was not criminally insane under Michigan law. In his supporting brief, Petitioner claims that because Dr. Clark's evaluation favored the prosecution, trial counsel strongly recommended that he get a third evaluation. Counsel allegedly told Petitioner that they needed another doctor to outweigh Clark because the defense had the burden of proving insanity by a preponderance of the evidence. Petitioner claims that counsel later told him that he did not believe that a third evaluation was necessary because Dr. Norris was firmly on their side and Dr. Clark's opinion was not strongly against them. Counsel related that he asked Clark during a phone conversation to rate on a scale of 1 to 10, one being not certain at all, and ten being very certain, how certain he was that Petitioner was criminally sane at the time of the offenses. Clark responded "2," indicating that he was not very certain that Petitioner was criminally sane.

Notwithstanding counsel's opinion that a third evaluation was not necessary, Petitioner asked for an adjournment of the trial so that Dr. Haskins could conduct a full psychiatric evaluation. As the trial approached, Petitioner claims that he asked counsel why he had not been interviewed by Haskins. Counsel informed Petitioner that Haskins had reviewed the reports prepared by Norris and Clark and Petitioner's other medical records, and concluded that it would be unnecessarily repetitious for him to conduct another examination. According to Petitioner,

counsel told him that Haskins would be able to give an opinion at trial as to Petitioner's mental state at the time of the offenses and present the jury with a full analysis of why he agreed with Dr. Norris' opinion and discredited Dr. Clark's conclusion that Petitioner was criminally sane.[6]

At a status conference held on March 3, 2004, trial counsel confirmed that he had retained someone to perform the third psychiatric evaluation of Petitioner. (Mar. 3, 2004 Status Conference Tr., 4-8, docket #20.) On April 6, 2004, the trial court held another status conference regarding the independent psychiatric evaluation. At this hearing, defense counsel stated:

> Your Honor, the Court has received some letters from my client and I have had a chance to discuss those with the client and I would point out to the Court and for the record that – that I – Mr. Lautner had some justifiable concerns. However, at this point we are set. We are not going to be calling another expert witness – oh, we are going to be calling an expert witness, we are not going to be seeking another forensic evaluation. The expert witness is Doctor Josh Haskins and we'll be sending that in a written notice to the prosecutor's office that we intend to be calling him as an expert witness.

(Apr. 6, 2004 Status Conference Tr., 4, docket #19.) Shortly thereafter, the trial court had Petitioner sworn in and questioned him regarding his satisfaction with his trial counsel:

> Q: Have you heard and understood everything your attorney has said?
>
> A: Yes, sir.
>
> Q: And do you agree with everything he's just said?
>
> A: I do. I had some reservations a month ago. He has done excellent this last month, really put forth effort and has cleared up any doubts that I've had.
>
> Q: All right. So you're completely satisfied with counsel?

---

[6]Petitioner's alleged discussions with defense counsel regarding Haskins' expert testimony are not part of the record in this case. The Michigan Court of appeals denied Petitioner's motion for an evidentiary hearing and Petitioner has not provided an affidavit.

A:  Yes.

(*Id.* at 5-6.)

At trial, the prosecutor objected to Petitioner's intention to call Dr. Haskins on the ground that Haskins had not conducted an independent examination of Petitioner, but had only reviewed the reports prepared by Doctors Norris and Clark.  (Tr. IV, 118-19.)  In response, defense counsel indicated that he did not intend to elicit Haskin's opinion as to Petitioner's mental state at the time of the offenses.  (Tr. IV, 120.)  Rather, defense counsel intended to ask Haskins hypothetical questions, elicit statements regarding standards within the field of forensic psychology and discuss the general processes that are part of forensic psychology.  (Tr. IV, 126-130.)  After hearing both sides, the trial court permitted Haskins to testify in generalities, but would not allow him to give an independent opinion regarding Petitioner's state of mind at the time of the offenses.  (Tr. IV, 126-27.)  At that point, Petitioner interrupted and told the trial court he was under the impression that Haskins would be able to testify that he was criminally insane on the day in question.  (Tr IV, 131.) The trial court responded that Haskins would not be able to so testify.  Petitioner then asked the trial court if he could make an objection and asked for an adjournment to obtain a full evaluation by Haskins.  The trial court refused to entertain his request.  (*Id.*)  Defense counsel then called Haskins, who testified generally about schizophrenia and addressed areas that had caused Clark to doubt that Petitioner was criminally insane.

The Michigan Court of Appeals found that Petitioner waived the issue by stating on the record that he agreed with his counsel's decision not to have Dr. Haskins conduct a full evaluation.  The Court further held that even if the issue had not been waived, Petitioner failed to establish that his trial counsel was ineffective:

Because defendant stated that he agreed with his trial counsel's decision not to have Haskins perform a full psychiatric evaluation and that he was completely satisfied with his trial counsel's performance, he has waived any error with regard to this issue. *Carter, supra* at 215. Further, to the extent that defendant argues that his counsel deliberately deceived him concerning whether Haskins would be able to state his opinion concerning defendant's criminal responsibility, this Court is limited to the record currently before it, *see Sabin, supra* at 658-659, and the record does not contain any evidence that defendant's trial counsel deliberately deceived defendant about the nature and extent of Haskins' testimony. Therefore, there is no reason to question the validity of the waiver. Furthermore, even if defendant had not waived this issue, decisions regarding the presentation of evidence and "whether to call or question witnesses are presumed to be matters of trial strategy," and this Court will not "substitute its judgment for that of counsel regarding matters of trial strategy, nor will it assess counsel's competence with the benefit of hindsight." *People v Garza*, 246 Mich App 251, 255; 631 NW2d 764 (2001). Consequently, without more, we cannot conclude that defendant's trial counsel's decision to utilize Haskins as a rebuttal witness rather than express an opinion concerning defendant's mental state constituted conduct that fell below an objective standard of reasonableness under prevailing professional norms.

Finally, even if defendant had not waived this issue and this Court could reasonably conclude that the failure to have Haskins make a full evaluation of defendant constituted conduct that fell below an objective standard of reasonableness, defendant has still failed to demonstrate that, but for this error, the outcome would have been different. In the present case, both defendant's expert and the prosecution's expert testified that defendant was mentally ill on the day he committed the charged offense. The only matter of dispute was whether defendant's mental illness deprived him of the ability to conform his conduct to the requirements of the law or to appreciate the nature and quality or the wrongfulness of his conduct. Yet, despite both experts' testimony, the jury returned a verdict of guilty on all counts rather than guilty but mentally ill. Because Haskins' testimony would have been cumulative to the opinions of Norris and Clark, it is doubtful that the addition of this testimony would have altered the outcome of the trial. *Toma, supra* at 302. Consequently, a new trial is not warranted on this basis.

(MCOA Op. 7.)

The decision of the Michigan Court of Appeals was not an unreasonable application of *Strickland*. As set forth above, in order to establish a claim of ineffective assistance of counsel, the petitioner must prove that counsel's performance fell below an objective standard of reasonableness and that counsel's deficient performance prejudiced the defendant resulting in an

unreliable or fundamentally unfair outcome. *Strickland*, 466 U.S. at 687-88. "When deciding ineffective-assistance claims, courts need not address both components of the inquiry 'if the defendant makes an insufficient showing on one.'" *Campbell v. United States*, 364 F.3d 727, 730 (6th Cir. 2004) (quoting *Strickland*, 466 U.S. at 697). "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." *Strickland*, 466 U.S. at 697. Because Petitioner cannot show prejudice as the result of counsel's conduct, the Court will forego discussion of the performance prong and go directly to the prejudice prong of the *Strickland* analysis.

Petitioner maintains that Haskin's opinion testimony would have tipped the scales in favor of the defense and resulted in a verdict of not guilty by reason of insanity. However, Petitioner cannot be certain what Haskin's opinion would have been after he conducted a full, independent evaluation. Even if Haskins had concluded after an independent evaluation that Petitioner was criminally insane at the time he committed the offenses, his expert testimony would have been cumulative of Dr. Norris' testimony. Norris arguably was the most credible expert witness because he was appointed by the Court, rather than being retained by one side or the other. Moreover, despite the testimony by both Doctors Norris and Clark that Petitioner was mentally ill, the jurors found Petitioner "guilty," not "guilty but mentally ill," which indicates that the jury was unlikely to reach a finding of not guilty by reason of insanity, even if Dr. Haskins had testified that Petitioner was criminally insane at the time of the offenses. In the absence of prejudice, Petitioner is not entitled to habeas corpus relief on his claim of ineffective assistance of counsel (Ground IV).

Petitioner claims in Ground III that his Fifth, Sixth and Fourteenth Amendment rights were violated when his trial counsel failed to have a clinician of his choice perform a full psychiatric

evaluation. The facts and argument presented in Petitioner's supporting brief relate to his Sixth Amendment claim of ineffective assistance of counsel, which was addressed above with regard to Ground IV. Petitioner did not argue or develop a Fifth or Fourteenth Amendment claim in the body of his brief and such claims were not addressed by the Michigan Court of Appeals. Likewise, this Court cannot discern how counsel's conduct implicates Petitioner's Fifth or Fourteenth Amendment rights. "'[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.'" *See Dillery v. City of Sandusky*, 398 F.3d 562, 569 (6th Cir. 2005) (quoting *United States v. Layne*, 192 F.3d 556, 566 (6th Cir. 1999)); *Bridges v. Cason*, 198 F. App'x 491, 496 (6th Cir. Oct. 4, 2006).[7] Petitioner, therefore, is not entitled to habeas corpus relief on Ground III.

---

[7]To the extent Petitioner claims that his due process rights were violated by the trial court's ruling limiting Haskins' testimony, that issue is addressed below in Part IV of the Discussion.

## IV.    Trial Court's Exclusion of Dr. Haskins Opinion Regarding Petitioner's State of Mind at the Time of the Offense: Ground V

Petitioner contends that his constitutional rights were violated when the trial court ruled that his rebuttal expert witness, Dr. Haskins, could not opine as to Petitioner's state of mind at the time of the offenses.[8]  The Michigan Court of Appeals found that the issue was not properly preserved at trial and reviewed the issue only for plain error.  The court concluded that, under Michigan law, the trial court did not err in limiting Haskins' testimony, and, thus, no plain error had occurred.  (*See* MCOA Op. 10-12.)

The extraordinary remedy of habeas corpus lies only for a violation of the Constitution.  28 U.S.C. § 2254(a).  As the Supreme Court explained in *Estelle v. McGuire*, 502 U.S. 62 (1991), an inquiry whether evidence was properly admitted or improperly excluded under state law "is no part of the federal court's habeas review of a state conviction [for] it is not the province of a federal habeas court to re-examine state-court determinations on state-law questions." *Id.* at 67-68.   Rather, "[i]n conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States."  *Id.* at 68.  State-court evidentiary rulings cannot rise to the level of due process violations unless they offend some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.  *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000) (quotation omitted); *accord Coleman v. Mitchell*, 268 F.3d 417, 439 (6th Cir. 2001); *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003).  This approach accords the state courts wide latitude in ruling on evidentiary matters.  *Seymour*, 224 F.3d at 552 (6th Cir. 2000).

---

[8]The factual background for this claim is provided above in Part III of the Discussion.

Petitioner's claim relies exclusively on principles of state law. Moreover, Petitioner cannot show that the trial court's decision resulted in the denial of fundamental fairness as Petitioner received a full evaluation by Dr. Norris, who testified at trial that Petitioner was criminally insane at the time he committed the offenses. The fact that a second doctor, who did not conduct a full examination, was not permitted to offer the same opinion, did not rise to the level of a due process violation. Accordingly, Petitioner is not entitled to habeas corpus relief.

## V.       Evidence Tampering: Ground VI

In his sixth ground for habeas relief, Petitioner contends that his constitutional rights were violated when the prosecution tampered with evidence by ripping pages out of his journals, which were admitted into evidence at trial. Petitioner claims that he first became aware that pages were missing from his journals during his interview with Dr. Norris on May 6, 2003. Norris' copies of the journals did not include entries that Petitioner remembered making on March 12 and 13 regarding beautiful dreams that he had experienced. Petitioner first raised the issue before the trial court during a pre-trial hearing on August 5, 2003. (Hearing Tr., 23-25, docket #28.) The prosecutor confirmed on the record that the original journals were not in his office. According to the prosecutor, the police made two copies of the journals and gave one copy to defense counsel and the other copy to the prosecutor. (Hearing Tr., 26-27.)

Petitioner did not have an opportunity to view the original journals until the third day of trial, just before he was to testify. According to Petitioner, two pages were ripped out of one journal that contained the entries he made about the dreams he had March 12 and 13, 2003. Petitioner claimed that those entries showed his "happy, fun, peace-loving nature." (Tr. III, 239.) In the second journal, Petitioner claims that the entire front section, which contained several months

of entries leading up to the events in this case, was ripped out. As a result, the second journal opened directly to the entries made by Petitioner on March 14, which were dark and vengeful. Petitioner showed the journals to the trial court outside the presence of the jury and accused the prosecutor of ripping out all of his positive entries and leaving only the negative entries. (Tr. III, 238-39.) Petitioner believed that the missing entries were crucial to show his frame of mind in the days and months leading up to the events of March 15. Petitioner believed that it was the prosecutor, and not the police, who removed the pages. (Tr. III, 239.) The trial court refused to launch an investigation of the alleged tampering because there was no evidence to support Petitioner's theory, but the court permitted defense counsel to examine Petitioner regarding the content of the missing journal pages and his theory that the prosecutor removed the pages to damage the defense. (Tr. III, 239-40.)

On direct examination, Petitioner testified in detail about the beautiful dreams that he had on March 12 and 13 and the journal entries that he made about them. (Tr. III, 245-246.) He went on to explain how he discovered during his interview with Dr. Norris that those pages were missing from the copy of his journal that was provided to Dr. Norris. (Tr. III, 246, 250.) Petitioner further testified that he did not have an opportunity to check the original journals to confirm that pages were ripped out until that day. (Tr. III, 250.) Petitioner maintained that he did not rip pages out of the journals, except on rare occasions when he made notes to himself and ripped them out to go shopping or something of that nature. (Tr. III, 251.) Petitioner opined that it could have been the police or prosecutor that ripped out the pages, but expressed his belief that it was the prosecutor. (Tr. III, 251-52.) The issue was raised again on cross-examination during the following exchange between the prosecutor and Petitioner:

Q: We have your word that what was written on these pages was helpful to you; number one; we have your word for that?

A: It must have been, why else would you have ripped it out?

Q: Well, and we have your word that you didn't rip these out?

A: Yes, you have my word on that.

Q: So, what we do know is a journal that we found among many of your things, that the first page that's here is 3/14 and you're in black depression when you write this, how do we know you didn't get so drepressed that you ripped out the stuff that you wrote the day before?

A: You have to take my word for it.

Q: And this is the word of a man who's telling us on March 14th and 15th that his life is governed by signs?

A: Well, you're trying to prove that it wasn't governed by signs.

Q: Well, so how do we know that you didn't get a sign that said tear out those pages and throw them away and never tell a soul you did it?

A: I didn't.

(Tr. III, 263-64.)

Petitioner raised this issue before the Michigan Court of Appeals in a *pro se* supplemental brief. The court of appeals rejected Petitioner's claim, stating:

Defendant next contends that the trial court erred by not ordering an investigation after he informed it that someone had removed pages from his journals. We disagree.

A reversal is warranted in cases where the police intentionally suppress exculpatory evidence or, in bad faith, suppress potentially useful evidence. *People v Johnson*, 197 Mich App 362, 365; 494 NW2d 873 (1992); *People v Leigh*, 182 Mich App 96, 97-98; 451 NW2d 512 (1989). However, the defendant "bears the burden of showing that the evidence was exculpatory or that the police acted in bad faith." *Johnson, supra* at 365. Because defendant failed to present any evidence to corroborate his allegations that the police or prosecutor had removed exculpatory

journal entries or removed potentially useful journal entries in bad faith, the trial court was under no obligation to take any action concerning the claimed tampering.

(MCOA Op. 12-13.)

The decision of the Michigan Court of Appeals is patently reasonable under clearly established Supreme Court precedent. A criminal defendant's due process rights are violated if the government suppresses favorable evidence where that evidence is material to guilt or punishment, irrespective of the good or bad faith of the prosecution. *Strickler v. Greene*, 527 U.S. 263, 280 (1999); *Brady v. Maryland*, 373 U.S. 83, 87 (1963). A *Brady* violation consists of three elements: (1) the evidence at issue must be favorable to the accused, either because it is exculpatory or impeaching; (2) the state must have suppressed the evidence, whether wilfully or inadvertently; and (3) prejudice must have resulted. *Strickler*, 527 U.S. at 281-82. The defendant has the burden of proving a *Brady* violation. *Carter v. Bell*, 218 F.3d 581, 601 (6th Cir. 2000) (citing *Moore v. Illinois*, 408 U.S. 786, 794-95 (1972)). The Supreme Court has held that the failure to disclose evidence is "material" and "prejudicial" to the defendant if the evidence creates a reasonable probability of a different result, *Strickler*, 527 U.S. at 280, 282, and that a reasonable probability of a different result exists if the government's suppression of evidence undermines confidence in the outcome of the trial, *Kyles v. Whitley*, 514 U.S. 419, 434 (1995).

Petitioner failed to meet his burden of establishing a *Brady* violation. First, Petitioner failed to establish that there were missing journal entries. Assuming that he could, he fails to show that the entries were exculpatory. While Petitioner seems to believe that the missing pages were somehow beneficial to the defense, he does not clearly articulate how entries concerning happy thoughts or feelings that he had up until March 12 and 13 would support his insanity defense for offenses that he committed on March 15. Second, even if it was apparent that pages had been ripped

out of the journals, Petitioner offers no evidence to support his theory that it was the prosecutor or police officers that removed the pages. While Petitioner testified that he typically did not tear pages out of his journals, he repeatedly testified that he could not even recall making the journal entries on March 14 and 15. Given Petitioner's state of mind in the days leading up to the offenses in this case, the jury could have reasonably concluded that Petitioner never made the entries or that he ripped the pages out of his journals. Finally, Petitioner cannot show prejudice as a result of the prosecutor's alleged conduct. The trial court permitted Petitioner to testify at length regarding the alleged missing journal entries and his belief that the prosecutor intentionally ripped them out because they were favorable to the defense. In addition, Petitioner gave detailed testimony regarding his mental state from January 1, 2002, through the events of March 15, 2003. Thus, the jury was presented with extensive testimony regarding the alleged March 12 and 13 journal entries and could consider that evidence in reaching their verdict.

### **Recommended Disposition**

For the foregoing reasons, I respectfully recommend that the habeas corpus petition be denied.


Dated:  February 16, 2010                                    /s/ Hugh W. Brenneman, Jr.
                                                            HUGH W. BRENNEMAN, JR.
                                                            United States Magistrate Judge

**<u>NOTICE TO PARTIES</u>**

Any objections to this Report and Recommendation must be filed and served within fourteen days of service of this notice on you.  28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b).  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to file timely objections may constitute a waiver of any further right of appeal.  *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).